INTERNATIONAL UNION, UNITED AUTOMOBILE,
AEROSPACE & AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW, ET AL.
*v.* JOHNSON CONTROLS, INC.

No. 89–1215.   Argued October 10, 1990—Decided March 20, 1991

188

BLACKMUN, J., delivered the opinion of the Court, in which MARSHALL, STEVENS, O'CONNOR, and SOUTER, JJ., joined. WHITE, J., filed an opinion concurring in part and concurring in the judgment, in which REHNQUIST, C. J., and KENNEDY, J., joined, *post*, p. 211. SCALIA, J., filed an opinion concurring in the judgment, *post*, p. 223.

*Marsha S. Berzon* argued the cause for petitioners. With her on the briefs were *Jordan Rossen, Ralph O. Jones*, and *Laurence Gold*.

*Stanley S. Jaspan* argued the cause for respondent. With him on the briefs were *Susan R. Maisa, Anita M. Sorensen, Charles G. Curtis, Jr.*, and *John P. Kennedy.**

---

*Briefs of *amici curiae* urging reversal were filed for the United States et al. by *Solicitor General Starr, Assistant Attorney General Dunne, Deputy Solicitor General Roberts, Deputy Assistant Attorney General Clegg, Clifford M. Sloan, David K. Flynn, Charles A. Shanor, Gwendolyn Young Reams, Lorraine C. Davis*, and *Carolyn L. Wheeler;* for the State of California et al. by *John K. Van de Kamp*, Attorney General, *Andrea Sheridan Ordin*, Chief Assistant Attorney General, *Marian M. Johnston*, Supervising Deputy Attorney General, and *Manuel M. Medeiros*, Deputy Attorney General; for the Commonwealth of Massachusetts et al. by *James M. Shannon*, Attorney General of Massachusetts, *Jennifer Wriggins, Marjorie Heins*, and *Judith E. Beals*, Assistant Attorneys General, and by the Attorneys General for their respective jurisdictions as follows: *Robert K. Corbin* of Arizona, *Clarine Nardi Riddle* of Connecticut, *Charles M. Oberly III* of Delaware, *Robert A. Butterworth* of Florida, *William J. Guste, Jr.*, of Louisiana, *James E. Tierney* of Maine, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Robert M. Spire* of Ne-

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case we are concerned with an employer's gender-based fetal-protection policy. May an employer exclude a fertile female employee from certain jobs because of its concern for the health of the fetus the woman might conceive?

## I

Respondent Johnson Controls, Inc., manufactures batteries. In the manufacturing process, the element lead is a primary ingredient. Occupational exposure to lead entails health risks, including the risk of harm to any fetus carried by a female employee.

braska, *Robert J. Del Tufo* of New Jersey, *Robert Abrams* of New York, *Anthony J. Celebrezze, Jr.,* of Ohio, *Robert H. Henry* of Oklahoma, *Hector Rivera-Cruz* of Puerto Rico, *Jim Mattox* of Texas, *Jeffrey L. Amestoy* of Vermont, *Godfrey R. de Castro* of the Virgin Islands, and *Kenneth O. Eikenberry* of Washington; for the American Civil Liberties Union et al. by *Joan E. Bertin, Elisabeth A. Werby,* and *Isabelle Katz Pinzler;* for the American Public Health Association et al. by *Nadine Taub* and *Suzanne L. Mager;* for Equal Rights Advocates et al. by *Susan Deller Ross* and *Naomi R. Cahn;* for the NAACP Legal Defense and Educational Fund, Inc., et al., by *Julius LeVonne Chambers, Charles Stephen Ralston,* and *Ronald L. Ellis;* and for Trial Lawyers for Public Justice by *Arthur H. Bryant.*

Briefs of *amici curiae* urging affirmance were filed for the Chamber of Commerce of the United States of America by *Timothy B. Dyk, Willis J. Goldsmith, Stephen A. Bokat,* and *Robin S. Conrad;* for Concerned Women for America by *Jordan W. Lorence, Cimron Campbell,* and *Wendell R. Bird;* for the Equal Employment Advisory Council et al. by *Robert E. Williams, Douglas S. McDowell, Garen E. Dodge, Jan S. Amundson,* and *Quentin Riegel;* for the Industrial Hygiene Law Project by *Jack Levy* and *Ilise Levy Feitshans;* for the National Safe Workplace Institute by *James D. Holzhauer;* for the United States Catholic Conference by *Mark E. Chopko* and *John A. Liekweg;* and for the Washington Legal Foundation by *Daniel J. Popeo, Paul D. Kamenar,* and *John C. Scully.*

Briefs of *amici curiae* were filed for the Association of the Bar of the City of New York et al. by *Sidney S. Rosdeitcher, Evelyn Cohn, Janet Gallagher, Janice Goodman, Arthur Leonard,* and *Jim Williams;* for the Natural Resources Defense Council, Inc., by *Thomas O. McGarity* and *Albert H. Meyerhoff;* and for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun* and *Anthony T. Caso.*

Before the Civil Rights Act of 1964, 78 Stat. 241, became law, Johnson Controls did not employ any woman in a battery-manufacturing job. In June 1977, however, it announced its first official policy concerning its employment of women in lead-exposure work:

"[P]rotection of the health of the unborn child is the immediate and direct responsibility of the prospective parents. While the medical profession and the company can support them in the exercise of this responsibility, it cannot assume it for them without simultaneously infringing their rights as persons.

". . . . Since not all women who can become mothers wish to become mothers (or will become mothers), it would appear to be illegal discrimination to treat all who are capable of pregnancy as though they will become pregnant." App. 140.

Consistent with that view, Johnson Controls "stopped short of excluding women capable of bearing children from lead exposure," *id.*, at 138, but emphasized that a woman who expected to have a child should not choose a job in which she would have such exposure. The company also required a woman who wished to be considered for employment to sign a statement that she had been advised of the risk of having a child while she was exposed to lead. The statement informed the woman that although there was evidence "that women exposed to lead have a higher rate of abortion," this evidence was "not as clear . . . as the relationship between cigarette smoking and cancer," but that it was, "medically speaking, just good sense not to run that risk if you want children and do not want to expose the unborn child to risk, however small . . . ." *Id.*, at 142–143.

Five years later, in 1982, Johnson Controls shifted from a policy of warning to a policy of exclusion. Between 1979 and 1983, eight employees became pregnant while maintaining blood lead levels in excess of 30 micrograms per deciliter. Tr. of Oral Arg. 25, 34. This appeared to be the critical level

noted by the Occupational Safety and Health Administration (OSHA) for a worker who was planning to have a family. See 29 CFR § 1910.1025 (1990). The company responded by announcing a broad exclusion of women from jobs that exposed them to lead:

> "[I]t is [Johnson Controls'] policy that women who are pregnant or who are capable of bearing children will not be placed into jobs involving lead exposure or which could expose them to lead through the exercise of job bidding, bumping, transfer or promotion rights." App. 85–86.

The policy defined "women . . . capable of bearing children" as "[a]ll women except those whose inability to bear children is medically documented." *Id.*, at 81. It further stated that an unacceptable work station was one where, "over the past year," an employee had recorded a blood lead level of more than 30 micrograms per deciliter or the work site had yielded an air sample containing a lead level in excess of 30 micrograms per cubic meter. *Ibid.*

## II

In April 1984, petitioners filed in the United States District Court for the Eastern District of Wisconsin a class action challenging Johnson Controls' fetal-protection policy as sex discrimination that violated Title VII of the Civil Rights Act of 1964, as amended, 42 U. S. C. § 2000e *et seq.* Among the individual plaintiffs were petitioners Mary Craig, who had chosen to be sterilized in order to avoid losing her job, Elsie Nason, a 50-year-old divorcee, who had suffered a loss in compensation when she was transferred out of a job where she was exposed to lead, and Donald Penney, who had been denied a request for a leave of absence for the purpose of lowering his lead level because he intended to become a father. Upon stipulation of the parties, the District Court certified a class consisting of "all past, present and future production and maintenance employees" in United Auto Workers bar-

gaining units at nine of Johnson Controls' plants "who have been and continue to be affected by [the employer's] Fetal Protection Policy implemented in 1982." No. 84–C–0472 (Feb. 25, 1985), pp. 1, 2.

The District Court granted summary judgment for defendant-respondent Johnson Controls. 680 F. Supp. 309 (1988). Applying a three-part business necessity defense derived from fetal-protection cases in the Courts of Appeals for the Fourth and Eleventh Circuits, the District Court concluded that while "there is a disagreement among the experts regarding the effect of lead on the fetus," the hazard to the fetus through exposure to lead was established by "a considerable body of opinion"; that although "[e]xpert opinion has been provided which holds that lead also affects the reproductive abilities of men and women . . . [and] that these effects are as great as the effects of exposure of the fetus . . . a great body of experts are of the opinion that the fetus is more vulnerable to levels of lead that would not affect adults"; and that petitioners had "failed to establish that there is an acceptable alternative policy which would protect the fetus." *Id.*, at 315–316. The court stated that, in view of this disposition of the business necessity defense, it did not "have to undertake a bona fide occupational qualification's *[sic]* (BFOQ) analysis." *Id.*, at 316, n. 5.

The Court of Appeals for the Seventh Circuit, sitting en banc, affirmed the summary judgment by a 7-to-4 vote. 886 F. 2d 871 (1989). The majority held that the proper standard for evaluating the fetal-protection policy was the defense of business necessity; that Johnson Controls was entitled to summary judgment under that defense; and that even if the proper standard was a BFOQ, Johnson Controls still was entitled to summary judgment.

The Court of Appeals, see *id.*, at 883–885, first reviewed fetal-protection opinions from the Eleventh and Fourth Circuits. See *Hayes* v. *Shelby Memorial Hospital*, 726 F. 2d 1543 (CA11 1984), and *Wright* v. *Olin Corp.*, 697 F. 2d 1172

(CA4 1982). Those opinions established the three-step business necessity inquiry: whether there is a substantial health risk to the fetus; whether transmission of the hazard to the fetus occurs only through women; and whether there is a less discriminatory alternative equally capable of preventing the health hazard to the fetus. 886 F. 2d, at 885. The Court of Appeals agreed with the Eleventh and Fourth Circuits that "the components of the business necessity defense the courts of appeals and the EEOC have utilized in fetal protection cases balance the interests of the employer, the employee and the unborn child in a manner consistent with Title VII." Id., at 886. The court further noted that, under Wards Cove Packing Co. v. Atonio, 490 U. S. 642 (1989), the burden of persuasion remained on the plaintiff in challenging a business necessity defense, and—unlike the Fourth and Eleventh Circuits—it thus imposed the burden on the plaintiffs for all three steps. 886 F. 2d, at 887–893. Cf. Hayes, 726 F. 2d, at 1549, and Wright, 697 F. 2d, at 1187.

Applying this business necessity defense, the Court of Appeals ruled that Johnson Controls should prevail. Specifically, the court concluded that there was no genuine issue of material fact about the substantial health-risk factor because the parties agreed that there was a substantial risk to a fetus from lead exposure. 886 F. 2d, at 888–889. The Court of Appeals also concluded that, unlike the evidence of risk to the fetus from the mother's exposure, the evidence of risk from the father's exposure, which petitioners presented, "is, at best, speculative and unconvincing." Id., at 889. Finally, the court found that petitioners had waived the issue of less discriminatory alternatives by not adequately presenting it. It said that, in any event, petitioners had not produced evidence of less discriminatory alternatives in the District Court. Id., at 890–893.

Having concluded that the business necessity defense was the appropriate framework and that Johnson Controls satis-

fied that standard, the court proceeded to discuss the BFOQ defense and concluded that Johnson Controls met that test, too. *Id.*, at 893–894. The en banc majority ruled that industrial safety is part of the essence of respondent's business, and that the fetal-protection policy is reasonably necessary to further that concern. Quoting *Dothard* v. *Rawlinson*, 433 U. S. 321, 335 (1977), the majority emphasized that, in view of the goal of protecting the unborn, "more is at stake" than simply an individual woman's decision to weigh and accept the risks of employment. 886 F. 2d, at 898.

Judges Cudahy and Posner dissented and would have reversed the judgment and remanded the case for trial. Judge Cudahy explained: "It may (and should) be difficult to establish a BFOQ here but I would afford the defendant an opportunity to try." *Id.*, at 901. "[T]he BFOQ defense need not be narrowly limited to matters of worker productivity, product quality and occupational safety." *Id.*, at 902, n. 1. He concluded that this case's "painful complexities are manifestly unsuited for summary judgment." *Id.*, at 902.

Judge Posner stated: "I think it a mistake to suppose that we can decide this case once and for all on so meager a record." *Ibid.* He, too, emphasized that, under Title VII, a fetal-protection policy which explicitly applied just to women could be defended only as a BFOQ. He observed that Title VII defines a BFOQ defense as a " 'bona fide occupational qualification reasonably necessary to the normal operation' " of a business, and that "the 'normal operation' of a business encompasses ethical, legal, and business concerns about the effects of an employer's activities on third parties." *Id.*, at 902 and 904. He emphasized, however, that whether a particular policy is lawful is a question of fact that should ordinarily be resolved at trial. *Id.*, at 906. Like Judge Cudahy, he stressed that "it will be the rare case where the lawfulness of such a policy can be decided on the defendant's motion for summary judgment." *Ibid.*

Judge Easterbrook, also in dissent and joined by Judge Flaum, agreed with Judges Cudahy and Posner that the only defense available to Johnson Controls was the BFOQ. He concluded, however, that the BFOQ defense would not prevail because respondent's stated concern for the health of the unborn was irrelevant to the operation of its business under the BFOQ. He also viewed the employer's concern as irrelevant to a woman's ability or inability to work under the Pregnancy Discrimination Act's amendment to Title VII, 92 Stat. 2076, 42 U. S. C. §2000e(k). Judge Easterbrook also stressed what he considered the excessive breadth of Johnson Controls' policy. It applied to all women (except those with medical proof of incapacity to bear children) although most women in an industrial labor force do not become pregnant, most of those who do become pregnant will have blood lead levels under 30 micrograms per deciliter, and most of those who become pregnant with levels exceeding that figure will bear normal children anyway. 886 F. 2d, at 912–913. "Concerns about a tiny minority of women cannot set the standard by which all are judged." *Id.*, at 913.

With its ruling, the Seventh Circuit became the first Court of Appeals to hold that a fetal-protection policy directed exclusively at women could qualify as a BFOQ. We granted certiorari, 494 U. S. 1055 (1990), to resolve the obvious conflict between the Fourth, Seventh, and Eleventh Circuits on this issue, and to address the important and difficult question whether an employer, seeking to protect potential fetuses, may discriminate against women just because of their ability to become pregnant.[1]

---

[1] Since our grant of certiorari, the Sixth Circuit has reversed a District Court's summary judgment for an employer that had excluded fertile female employees from foundry jobs involving exposure to specified concentrations of airborne lead. See *Grant* v. *General Motors Corp.*, 908 F. 2d 1303 (1990). The court said: "We agree with the view of the dissenters in *Johnson Controls* that fetal protection policies perforce amount to overt sex discrimination, which cannot logically be recast as disparate impact and

## III

The bias in Johnson Controls' policy is obvious. Fertile men, but not fertile women, are given a choice as to whether they wish to risk their reproductive health for a particular job. Section 703(a) of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 42 U. S. C. § 2000e–2(a), prohibits sex-based classifications in terms and conditions of employment, in hiring and discharging decisions, and in other employment decisions that adversely affect an employee's status.[2] Respondent's fetal-protection policy explicitly discriminates against women on the basis of their sex. The policy excludes women with childbearing capacity from lead-exposed jobs and so creates a facial classification based on gender. Respondent assumes as much in its brief before this Court. Brief for Respondent 17, n. 24.

Nevertheless, the Court of Appeals assumed, as did the two appellate courts that already had confronted the issue, that sex-specific fetal-protection policies do not involve facial discrimination. 886 F. 2d, at 886–887; *Hayes,* 726 F. 2d, at 1547; *Wright,* 697 F. 2d, at 1190. These courts analyzed the policies as though they were facially neutral and had only a

cannot be countenanced without proof that infertility is a BFOQ. . . . [P]laintiff . . . has alleged a claim of overt discrimination that her employer may justify only through the BFOQ defense." *Id.,* at 1310.

In *Johnson Controls, Inc.* v. *Fair Employment & Housing Comm'n,* 218 Cal. App. 3d 517, 267 Cal. Rptr. 158 (1990), the court held respondent's fetal-protection policy invalid under California's fair-employment law.

[2] The statute reads:

"It shall be an unlawful employment practice for an employer—

"(1) to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

"(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

discriminatory effect upon the employment opportunities of women. Consequently, the courts looked to see if each employer in question had established that its policy was justified as a business necessity. The business necessity standard is more lenient for the employer than the statutory BFOQ defense. The Court of Appeals here went one step further and invoked the burden-shifting framework set forth in *Wards Cove Packing Co.* v. *Atonio*, 490 U. S. 642 (1989), thus requiring petitioners to bear the burden of persuasion on all questions. 886 F. 2d, at 887–888. The court assumed that because the asserted reason for the sex-based exclusion (protecting women's unconceived offspring) was ostensibly benign, the policy was not sex-based discrimination. That assumption, however, was incorrect.

First, Johnson Controls' policy classifies on the basis of gender and childbearing capacity, rather than fertility alone. Respondent does not seek to protect the unconceived children of all its employees. Despite evidence in the record about the debilitating effect of lead exposure on the male reproductive system, Johnson Controls is concerned only with the harms that may befall the unborn offspring of its female employees. Accordingly, it appears that Johnson Controls would have lost in the Eleventh Circuit under *Hayes* because its policy does not "effectively and equally protec[t] the offspring of all employees." 726 F. 2d, at 1548. This Court faced a conceptually similar situation in *Phillips* v. *Martin Marietta Corp.*, 400 U. S. 542 (1971), and found sex discrimination because the policy established "one hiring policy for women and another for men—each having pre-school-age children." *Id.*, at 544. Johnson Controls' policy is facially discriminatory because it requires only a female employee to produce proof that she is not capable of reproducing.

Our conclusion is bolstered by the Pregnancy Discrimination Act (PDA), 42 U. S. C. § 2000e(k), in which Congress explicitly provided that, for purposes of Title VII, discrimination " 'on the basis of sex' " includes discrimination "because

of or on the basis of pregnancy, childbirth, or related medical conditions."[3] "The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 684 (1983). In its use of the words "capable of bearing children" in the 1982 policy statement as the criterion for exclusion, Johnson Controls explicitly classifies on the basis of potential for pregnancy. Under the PDA, such a classification must be regarded, for Title VII purposes, in the same light as explicit sex discrimination. Respondent has chosen to treat all its female employees as potentially pregnant; that choice evinces discrimination on the basis of sex.

We concluded above that Johnson Controls' policy is not neutral because it does not apply to the reproductive capacity of the company's male employees in the same way as it applies to that of the females. Moreover, the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination. In *Martin Marietta, supra,* the motives underlying the employers' express exclusion of women did not alter the intentionally discriminatory character of the policy. Nor did the arguably benign motives lead to consideration of a business necessity defense. The ques-

---

[3] The Act added subsection (k) to § 701 of the Civil Rights Act of 1964 and reads in pertinent part:

"The terms 'because of sex' or 'on the basis of sex' [in Title VII] include, but are not limited to, because of or on the basis of pregnancy, childbirth, or related medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ."

tion in that case was whether the discrimination in question could be justified under § 703(e) as a BFOQ. The beneficence of an employer's purpose does not undermine the conclusion that an explicit gender-based policy is sex discrimination under § 703(a) and thus may be defended only as a BFOQ.

The enforcement policy of the Equal Employment Opportunity Commission accords with this conclusion. On January 24, 1990, the EEOC issued a Policy Guidance in the light of the Seventh Circuit's decision in the present case. App. to Pet. for Cert. 127a. The document noted: "For the plaintiff to bear the burden of proof in a case in which there is direct evidence of a facially discriminatory policy is wholly inconsistent with settled Title VII law." *Id.*, at 133a. The Commission concluded: "[W]e now think BFOQ is the better approach." *Id.*, at 134a.

In sum, Johnson Controls' policy "does not pass the simple test of whether the evidence shows 'treatment of a person in a manner which but for that person's sex would be different.'" *Los Angeles Dept. of Water and Power* v. *Manhart*, 435 U. S. 702, 711 (1978), quoting Developments in the Law, Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv. L. Rev. 1109, 1170 (1971). We hold that Johnson Controls' fetal-protection policy is sex discrimination forbidden under Title VII unless respondent can establish that sex is a "bona fide occupational qualification."

## IV

Under § 703(e)(1) of Title VII, an employer may discriminate on the basis of "religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U. S. C. § 2000e–2(e)(1). We therefore turn to the question whether Johnson Controls' fetal-protection pol-

icy is one of those "certain instances" that come within the BFOQ exception.

The BFOQ defense is written narrowly, and this Court has read it narrowly. See, e. g., *Dothard* v. *Rawlinson*, 433 U. S. 321, 332–337 (1977); *Trans World Airlines, Inc.* v. *Thurston*, 469 U. S. 111, 122–125 (1985). We have read the BFOQ language of §4(f) of the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 603, as amended, 29 U. S. C. §623(f)(1), which tracks the BFOQ provision in Title VII, just as narrowly. See *Western Air Lines, Inc.* v. *Criswell*, 472 U. S. 400 (1985). Our emphasis on the restrictive scope of the BFOQ defense is grounded on both the language and the legislative history of §703.

The wording of the BFOQ defense contains several terms of restriction that indicate that the exception reaches only special situations. The statute thus limits the situations in which discrimination is permissible to "certain instances" where sex discrimination is "reasonably necessary" to the "normal operation" of the "particular" business. Each one of these terms—certain, normal, particular—prevents the use of general subjective standards and favors an objective, verifiable requirement. But the most telling term is "occupational"; this indicates that these objective, verifiable requirements must concern job-related skills and aptitudes.

JUSTICE WHITE defines "occupational" as meaning related to a job. *Post*, at 212, n. 1. According to him, any discriminatory requirement imposed by an employer is "job-related" simply because the employer has chosen to make the requirement a condition of employment. In effect, he argues that sterility may be an occupational qualification for women because Johnson Controls has chosen to require it. This reading of "occupational" renders the word mere surplusage. "Qualification" by itself would encompass an employer's idiosyncratic requirements. By modifying "qualification" with "occupational," Congress narrowed the term to qualifications that affect an employee's ability to do the job.

Johnson Controls argues that its fetal-protection policy falls within the so-called safety exception to the BFOQ. Our cases have stressed that discrimination on the basis of sex because of safety concerns is allowed only in narrow circumstances. In *Dothard* v. *Rawlinson*, this Court indicated that danger to a woman herself does not justify discrimination. 433 U. S., at 335. We there allowed the employer to hire only male guards in contact areas of maximum-security male penitentiaries only because more was at stake than the "individual woman's decision to weigh and accept the risks of employment." *Ibid.* We found sex to be a BFOQ inasmuch as the employment of a female guard would create real risks of safety to others if violence broke out because the guard was a woman. Sex discrimination was tolerated because sex was related to the guard's ability to do the job—maintaining prison security. We also required in *Dothard* a high correlation between sex and ability to perform job functions and refused to allow employers to use sex as a proxy for strength although it might be a fairly accurate one.

Similarly, some courts have approved airlines' layoffs of pregnant flight attendants at different points during the first five months of pregnancy on the ground that the employer's policy was necessary to ensure the safety of passengers. See *Harriss* v. *Pan American World Airways, Inc.*, 649 F. 2d 670 (CA9 1980); *Burwell* v. *Eastern Air Lines, Inc.*, 633 F. 2d 361 (CA4 1980), cert. denied, 450 U. S. 965 (1981); *Condit* v. *United Air Lines, Inc.*, 558 F. 2d 1176 (CA4 1977), cert. denied, 435 U. S. 934 (1978); *In re National Airlines, Inc.*, 434 F. Supp. 249 (SD Fla. 1977). In two of these cases, the courts pointedly indicated that fetal, as opposed to passenger, safety was best left to the mother. *Burwell*, 633 F. 2d, at 371; *National Airlines*, 434 F. Supp., at 259.

We considered safety to third parties in *Western Airlines, Inc.* v. *Criswell, supra,* in the context of the ADEA. We focused upon "the nature of the flight engineer's tasks," and the "actual capabilities of persons over age 60" in relation to

those tasks. 472 U. S., at 406. Our safety concerns were not independent of the individual's ability to perform the assigned tasks, but rather involved the possibility that, because of age-connected debility, a flight engineer might not properly assist the pilot, and might thereby cause a safety emergency. Furthermore, although we considered the safety of third parties in *Dothard* and *Criswell*, those third parties were indispensable to the particular business at issue. In *Dothard*, the third parties were the inmates; in *Criswell*, the third parties were the passengers on the plane. We stressed that in order to qualify as a BFOQ, a job qualification must relate to the "'essence,'" *Dothard*, 433 U. S., at 333 (emphasis deleted), or to the "central mission of the employer's business," *Criswell*, 472 U. S., at 413.

JUSTICE WHITE ignores the "essence of the business" test and so concludes that "protecting fetal safety while carrying out the duties of battery manufacturing is as much a legitimate concern as is safety to third parties in guarding prisons *(Dothard)* or flying airplanes *(Criswell)*." *Post*, at 217. By limiting his discussion to cost and safety concerns and rejecting the "essence of the business" test that our case law has established, he seeks to expand what is now the narrow BFOQ defense. Third-party safety considerations properly entered into the BFOQ analysis in *Dothard* and *Criswell* because they went to the core of the employee's job performance. Moreover, that performance involved the central purpose of the enterprise. *Dothard*, 433 U. S., at 335 ("The essence of a correctional counselor's job is to maintain prison security"); *Criswell*, 472 U. S., at 413 (the central mission of the airline's business was the safe transportation of its passengers). JUSTICE WHITE attempts to transform this case into one of customer safety. The unconceived fetuses of Johnson Controls' female employees, however, are neither customers nor third parties whose safety is essential to the business of battery manufacturing. No one can disregard the possibility of injury to future children; the BFOQ, how-

ever, is not so broad that it transforms this deep social concern into an essential aspect of battery making.

Our case law, therefore, makes clear that the safety exception is limited to instances in which sex or pregnancy actually interferes with the employee's ability to perform the job. This approach is consistent with the language of the BFOQ provision itself, for it suggests that permissible distinctions based on sex must relate to ability to perform the duties of the job. Johnson Controls suggests, however, that we expand the exception to allow fetal-protection policies that mandate particular standards for pregnant or fertile women. We decline to do so. Such an expansion contradicts not only the language of the BFOQ and the narrowness of its exception, but also the plain language and history of the PDA.

The PDA's amendment to Title VII contains a BFOQ standard of its own: Unless pregnant employees differ from others "in their ability or inability to work," they must be "treated the same" as other employees "for all employment-related purposes." 42 U. S. C. § 2000e(k). This language clearly sets forth Congress' remedy for discrimination on the basis of pregnancy and potential pregnancy. Women who are either pregnant or potentially pregnant must be treated like others "similar in their ability . . . to work." *Ibid.* In other words, women as capable of doing their jobs as their male counterparts may not be forced to choose between having a child and having a job.

JUSTICE WHITE asserts that the PDA did not alter the BFOQ defense. *Post*, at 218. He arrives at this conclusion by ignoring the second clause of the Act, which states that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U. S. C. § 2000e(k). Until this day, every Member of this Court had acknowledged that "[t]he second clause [of the PDA] could not be clearer: it mandates that pregnant employees 'shall be

treated the same for all employment-related purposes' as nonpregnant employees similarly situated with respect to their ability or inability to work." *California Federal Savings and Loan Assn.* v. *Guerra,* 479 U. S. 272, 297 (1987) (WHITE, J., dissenting). JUSTICE WHITE now seeks to read the second clause out of the Act.

The legislative history confirms what the language of the PDA compels. Both the House and Senate Reports accompanying the legislation indicate that this statutory standard was chosen to protect female workers from being treated differently from other employees simply because of their capacity to bear children. See Amending Title VII, Civil Rights Act of 1964, S. Rep. No. 95–331, pp. 4–6 (1977):

> "Under this bill, the treatment of pregnant women in covered employment must focus not on their condition alone but on the actual effects of that condition on their ability to work. Pregnant women who are able to work must be permitted to work on the same conditions as other employees . . . .

> .      .      . .      .      .

> "[U]nder this bill, employers will no longer be permitted to force women who become pregnant to stop working regardless of their ability to continue."

See also Prohibition of Sex Discrimination Based on Pregnancy, H. R. Rep. No. 95–948, pp. 3–6 (1978).

This history counsels against expanding the BFOQ to allow fetal-protection policies. The Senate Report quoted above states that employers may not require a pregnant woman to stop working at any time during her pregnancy unless she is unable to do her work. Employment late in pregnancy often imposes risks on the unborn child, see Chavkin, Walking a Tightrope: Pregnancy, Parenting, and Work, in Double Exposure 196, 196–202 (W. Chavkin ed. 1984), but Congress indicated that the employer may take into account only the woman's ability to get her job done. See Becker, From *Muller v. Oregon* to Fetal Vulnerability Policies, 53 U. Chi.

L. Rev. 1219, 1255–1256 (1986). With the PDA, Congress made clear that the decision to become pregnant or to work while being either pregnant or capable of becoming pregnant was reserved for each individual woman to make for herself.

We conclude that the language of both the BFOQ provision and the PDA which amended it, as well as the legislative history and the case law, prohibit an employer from discriminating against a woman because of her capacity to become pregnant unless her reproductive potential prevents her from performing the duties of her job. We reiterate our holdings in *Criswell* and *Dothard* that an employer must direct its concerns about a woman's ability to perform her job safely and efficiently to those aspects of the woman's job-related activities that fall within the "essence" of the particular business.[4]

## V

We have no difficulty concluding that Johnson Controls cannot establish a BFOQ. Fertile women, as far as appears in the record, participate in the manufacture of batteries as efficiently as anyone else. Johnson Controls' professed moral and ethical concerns about the welfare of the next generation do not suffice to establish a BFOQ of female sterility. Decisions about the welfare of future children must be left to the parents who conceive, bear, support, and raise them rather than to the employers who hire those parents. Congress has mandated this choice through Title VII, as amended by the

---

[4] JUSTICE WHITE predicts that our reaffirmation of the narrowness of the BFOQ defense will preclude considerations of privacy as a basis for sex-based discrimination. *Post*, at 219–220, n. 8. We have never addressed privacy-based sex discrimination and shall not do so here because the sex-based discrimination at issue today does not involve the privacy interests of Johnson Controls' customers. Nothing in our discussion of the "essence of the business test," however, suggests that sex could not constitute a BFOQ when privacy interests are implicated. See, *e. g.*, *Backus* v. *Baptist Medical Center*, 510 F. Supp. 1191 (ED Ark. 1981) (essence of obstetrics nurse's business is to provide sensitive care for patient's intimate and private concerns), vacated as moot, 671 F. 2d 1100 (CA8 1982).

PDA. Johnson Controls has attempted to exclude women because of their reproductive capacity. Title VII and the PDA simply do not allow a woman's dismissal because of her failure to submit to sterilization.

Nor can concerns about the welfare of the next generation be considered a part of the "essence" of Johnson Controls' business. Judge Easterbrook in this case pertinently observed: "It is word play to say that 'the job' at Johnson [Controls] is to make batteries without risk to fetuses in the same way 'the job' at Western Air Lines is to fly planes without crashing." 886 F. 2d, at 913.

Johnson Controls argues that it must exclude all fertile women because it is impossible to tell which women will become pregnant while working with lead. This argument is somewhat academic in light of our conclusion that the company may not exclude fertile women at all; it perhaps is worth noting, however, that Johnson Controls has shown no "factual basis for believing that all or substantially all women would be unable to perform safely and efficiently the duties of the job involved." *Weeks* v. *Southern Bell Tel. & Tel. Co.*, 408 F. 2d 228, 235 (CA5 1969), quoted with approval in *Dothard*, 433 U. S., at 333. Even on this sparse record, it is apparent that Johnson Controls is concerned about only a small minority of women. Of the eight pregnancies reported among the female employees, it has not been shown that any of the babies have birth defects or other abnormalities. The record does not reveal the birth rate for Johnson Controls' female workers, but national statistics show that approximately nine percent of all fertile women become pregnant each year. The birthrate drops to two percent for blue collar workers over age 30. See Becker, 53 U. Chi. L. Rev., at 1233. Johnson Controls' fear of prenatal injury, no matter how sincere, does not begin to show that substantially all of its fertile women employees are incapable of doing their jobs.

## VI

A word about tort liability and the increased cost of fertile women in the workplace is perhaps necessary. One of the dissenting judges in this case expressed concern about an employer's tort liability and concluded that liability for a potential injury to a fetus is a social cost that Title VII does not require a company to ignore. 886 F. 2d, at 904–905. It is correct to say that Title VII does not prevent the employer from having a conscience. The statute, however, does prevent sex-specific fetal-protection policies. These two aspects of Title VII do not conflict.

More than 40 States currently recognize a right to recover for a prenatal injury based either on negligence or on wrongful death. See, e. g., *Wolfe* v. *Isbell*, 291 Ala. 327, 333–334, 280 So. 2d 758, 763 (1973); *Simon* v. *Mullin*, 34 Conn. Supp. 139, 147, 380 A. 2d 1353, 1357 (1977). See also Note, 22 Suffolk U. L. Rev. 747, 754–756, and nn. 54, 57, and 58 (1988) (listing cases). According to Johnson Controls, however, the company complies with the lead standard developed by OSHA and warns its female employees about the damaging effects of lead. It is worth noting that OSHA gave the problem of lead lengthy consideration and concluded that "there is no basis whatsoever for the claim that women of childbearing age should be excluded from the workplace in order to protect the fetus or the course of pregnancy." 43 Fed. Reg. 52952, 52966 (1978). See also *id.*, at 54354, 54398. Instead, OSHA established a series of mandatory protections which, taken together, "should effectively minimize any risk to the fetus and newborn child." *Id.*, at 52966. See 29 CFR § 1910.1025(k)(ii) (1990). Without negligence, it would be difficult for a court to find liability on the part of the employer. If, under general tort principles, Title VII bans sex-specific fetal-protection policies, the employer fully informs the woman of the risk, and the employer has not acted negligently, the basis for holding an employer liable seems remote at best.

Although the issue is not before us, JUSTICE WHITE observes that "it is far from clear that compliance with Title VII will pre-empt state tort liability." *Post*, at 213. The cases relied upon by him to support his prediction, however, are inapposite. For example, in *California Federal Savings and Loan Assn.* v. *Guerra*, 479 U. S. 272 (1987), we considered a California statute that expanded upon the requirements of the PDA and concluded that the statute was not pre-empted by Title VII because it was not inconsistent with the purposes of the federal statute and did not require an act that was unlawful under Title VII. *Id.*, at 291–292. Here, in contrast, the tort liability that JUSTICE WHITE fears will punish employers for *complying* with Title VII's clear command. When it is impossible for an employer to comply with both state and federal requirements, this Court has ruled that federal law pre-empts that of the States. See, *e. g.*, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U. S. 132, 142–143 (1963).

This Court faced a similar situation in *Farmers Union* v. *WDAY, Inc.*, 360 U. S. 525 (1959). In *WDAY*, it held that § 315(a) of the Federal Communications Act of 1934 barred a broadcasting station from removing defamatory statements contained in speeches broadcast by candidates for public office. It then considered a libel action which arose as a result of a speech made over the radio and television facilities of WDAY by a candidate for the 1956 senatorial race in North Dakota. It held that the statutory prohibition of censorship carried with it an immunity from liability for defamatory statements made by the speaker. To allow libel actions "would sanction the unconscionable result of permitting civil and perhaps criminal liability to be imposed for the very conduct the statute demands of the licensee." *Id.*, at 531. It concluded:

> "We are aware that causes of action for libel are widely recognized throughout the States. But we have not hesitated to abrogate state law where satisfied that

its enforcement would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.*, at 535, quoting *Bethlehem Steel Co.* v. *New York State Labor Relations Bd.*, 330 U. S. 767, 773 (1947).

If state tort law furthers discrimination in the workplace and prevents employers from hiring women who are capable of manufacturing the product as efficiently as men, then it will impede the accomplishment of Congress' goals in enacting Title VII. Because Johnson Controls has not argued that it faces any costs from tort liability, not to mention crippling ones, the pre-emption question is not before us. We therefore say no more than that the concurrence's speculation appears unfounded as well as premature.

The tort-liability argument reduces to two equally unpersuasive propositions. First, Johnson Controls attempts to solve the problem of reproductive health hazards by resorting to an exclusionary policy. Title VII plainly forbids illegal sex discrimination as a method of diverting attention from an employer's obligation to police the workplace. Second, the specter of an award of damages reflects a fear that hiring fertile women will cost more. The extra cost of employing members of one sex, however, does not provide an affirmative Title VII defense for a discriminatory refusal to hire members of that gender. See *Manhart*, 435 U. S., at 716–718, and n. 32. Indeed, in passing the PDA, Congress considered at length the considerable cost of providing equal treatment of pregnancy and related conditions, but made the "decision to forbid special treatment of pregnancy despite the social costs associated therewith." *Arizona Governing Comm. for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris*, 463 U. S. 1073, 1085, n. 14 (1983) (opinion of MARSHALL, J.). See *Price Waterhouse* v. *Hopkins*, 490 U. S. 228 (1989).

We, of course, are not presented with, nor do we decide, a case in which costs would be so prohibitive as to threaten the

survival of the employer's business. We merely reiterate our prior holdings that the incremental cost of hiring women cannot justify discriminating against them.

## VII

Our holding today that Title VII, as so amended, forbids sex-specific fetal-protection policies is neither remarkable nor unprecedented. Concern for a woman's existing or potential offspring historically has been the excuse for denying women equal employment opportunities. See, *e. g.*, *Muller* v. *Oregon*, 208 U. S. 412 (1908). Congress in the PDA prohibited discrimination on the basis of a woman's ability to become pregnant. We do no more than hold that the PDA means what it says.

It is no more appropriate for the courts than it is for individual employers to decide whether a woman's reproductive role is more important to herself and her family than her economic role. Congress has left this choice to the woman as hers to make.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, concurring in part and concurring in the judgment.

The Court properly holds that Johnson Controls' fetal-protection policy overtly discriminates against women, and thus is prohibited by Title VII of the Civil Rights Act of 1964 unless it falls within the bona fide occupational qualification (BFOQ) exception, set forth at 42 U. S. C. § 2000e–2(e). The Court erroneously holds, however, that the BFOQ defense is so narrow that it could never justify a sex-specific fetal-protection policy. I nevertheless concur in the judgment of reversal because on the record before us summary judgment in favor of Johnson Controls was improperly en-

tered by the District Court and affirmed by the Court of Appeals.

## I

In evaluating the scope of the BFOQ defense, the proper starting point is the language of the statute. Cf. *Demarest* v. *Manspeaker*, 498 U. S. 184, 190 (1991); *Board of Ed. of Westside Community Schools (Dist. 66)* v. *Mergens*, 496 U. S. 226, 237 (1990). Title VII forbids discrimination on the basis of sex, except "in those certain instances where . . . sex . . . is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U. S. C. § 2000e–2(e)(1). For the fetal-protection policy involved in this case to be a BFOQ, therefore, the policy must be "reasonably necessary" to the "normal operation" of making batteries, which is Johnson Controls' "particular business." Although that is a difficult standard to satisfy, nothing in the statute's language indicates that it could *never* support a sex-specific fetal-protection policy.[1]

On the contrary, a fetal-protection policy would be justified under the terms of the statute if, for example, an employer could show that exclusion of women from certain jobs was reasonably necessary to avoid substantial tort liability. Common sense tells us that it is part of the normal operation of business concerns to avoid causing injury to third parties, as well as to employees, if for no other reason than to avoid

---

[1] The Court's heavy reliance on the word "'occupational'" in the BFOQ statute, *ante*, at 201, is unpersuasive. *Any* requirement for employment can be said to be an occupational qualification, since "occupational" merely means related to a job. See Webster's Third New International Dictionary 1560 (1976). Thus, Johnson Controls' requirement that employees engaged in battery manufacturing be either male or nonfertile clearly is an "occupational qualification." The issue, of course, is whether that qualification is "reasonably necessary to the normal operation" of Johnson Controls' business. It is telling that the Court offers no case support, either from this Court or the lower federal courts, for its interpretation of the word "occupational."

tort liability and its substantial costs. This possibility of tort liability is not hypothetical; every State currently allows children born alive to recover in tort for prenatal injuries caused by third parties, see W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 55, p. 368 (5th ed. 1984), and an increasing number of courts have recognized a right to recover even for prenatal injuries caused by torts committed prior to conception, see 3 F. Harper, F. James, & O. Gray, Law of Torts § 18.3, pp. 677–678, n. 15 (2d ed. 1986).

The Court dismisses the possibility of tort liability by no more than speculating that if "Title VII bans sex-specific fetal-protection policies, the employer fully informs the woman of the risk, and the employer has not acted negligently, the basis for holding an employer liable seems remote at best." *Ante*, at 208. Such speculation will be small comfort to employers. First, it is far from clear that compliance with Title VII will pre-empt state tort liability, and the Court offers no support for that proposition.[2] Second, although warnings may preclude claims by injured *employees*, they will not preclude claims by injured children because the general rule is that parents cannot waive causes of action on behalf of their children, and the parents' negligence will not be imputed to the children.[3] Finally, although state tort liabil-

---

[2] Cf. *English* v. *General Electric Co.*, 496 U. S. 72 (1990) (state law action for intentional infliction of emotional distress not pre-empted by Energy Reorganization Act of 1974); *California Federal Savings and Loan Assn.* v. *Guerra*, 479 U. S. 272, 290–292 (1987) (state statute requiring the provision of leave and reinstatement to employees disabled by pregnancy not pre-empted by the Pregnancy Discrimination Act (PDA), 92 Stat. 2076, 42 U. S. C. § 2000e(k)); *Silkwood* v. *Kerr-McGee Corp.*, 464 U. S. 238, 256 (1984) (state punitive damages claim not pre-empted by federal laws regulating nuclear powerplants); *Bernstein* v. *Aetna Life & Casualty*, 843 F. 2d 359, 364–365 (CA9 1988) ("It is well-established that Title VII does not pre-empt state common law remedies"); see also 42 U. S. C. § 2000e-7.

[3] See, *e. g.*, *In re Estate of Infant Fontaine*, 128 N. H. 695, 700, 519 A. 2d 227, 230 (1986); *Collins* v. *Eli Lilly Co.*, 116 Wis. 2d 166, 200, n. 14, 342

ity for prenatal injuries generally requires negligence, it will be difficult for employers to determine in advance what will constitute negligence. Compliance with OSHA standards, for example, has been held not to be a defense to state tort or criminal liability. See *National Solid Wastes Management Assn.* v. *Killian,* 918 F. 2d 671, 680, n. 9 (CA7 1990) (collecting cases); see also 29 U. S. C. § 653(b)(4). Moreover, it is possible that employers will be held strictly liable, if, for example, their manufacturing process is considered "abnormally dangerous." See Restatement (Second) of Torts § 869, Comment *b* (1979).

Relying on *Los Angeles Dept. of Water and Power* v. *Manhart,* 435 U. S. 702 (1978), the Court contends that tort liability cannot justify a fetal-protection policy because the extra costs of hiring women is not a defense under Title VII. *Ante,* at 210. This contention misrepresents our decision in *Manhart.* There, we held that a requirement that female employees contribute more than male employees to a pension fund, in order to reflect the greater longevity of women, constituted discrimination against women under Title VII because it treated them as a class rather than as individuals. 435 U. S., at 708, 716–717. We did not in that case address in any detail the nature of the BFOQ defense, and we certainly did not hold that cost was irrelevant to the BFOQ analysis. Rather, we merely stated in a footnote that "there has been no showing that sex distinctions are reasonably necessary to the normal operation of the Department's retirement plan." *Id.,* at 716, n. 30. We further noted that although Title VII does not contain a "cost-justification defense comparable to the affirmative defense available in a price dis-

---

N. W. 2d 37, 53, n. 14, cert. denied, 469 U. S. 826 (1984); *Doyle* v. *Bowdoin College,* 403 A. 2d 1206, 1208, n. 3 (Me. 1979); *Littleton* v. *Jordan,* 428 S. W. 2d 472 (Tex. Civ. App. 1968); *Fallaw* v. *Hobbs,* 113 Ga. App. 181, 182–183, 147 S. E. 2d 517, 519 (1966); see also Restatement (Second) of Torts § 488(1) (1965).

crimination suit," "no defense based on the *total* cost of employing men and women was attempted in this case." *Id.*, at 716–717, and n. 32.

Prior decisions construing the BFOQ defense confirm that the defense is broad enough to include considerations of cost and safety of the sort that could form the basis for an employer's adoption of a fetal-protection policy. In *Dothard* v. *Rawlinson*, 433 U. S. 321 (1977), the Court held that being male was a BFOQ for "contact" guard positions in Alabama's maximum-security male penitentiaries. The Court first took note of the actual conditions of the prison environment: "In a prison system where violence is the order of the day, where inmate access to guards is facilitated by dormitory living arrangements, where every institution is understaffed, and where a substantial portion of the inmate population is composed of sex offenders mixed at random with other prisoners, there are few visible deterrents to inmate assaults on women custodians." *Id.*, at 335–336. The Court also stressed that "[m]ore [was] at stake" than a risk to individual female employees: "The likelihood that inmates would assault a woman because she was a woman would pose a real threat not only to the victim of the assault but also to the basic control of the penitentiary and protection of its inmates and the other security personnel." *Ibid.* Under those circumstances, the Court observed that "it would be an oversimplification to characterize [the exclusion of women] as an exercise in 'romantic paternalism.'" Cf. *Frontiero* v. *Richardson*, 411 U. S. 677, 684." *Id.*, at 335.

We revisited the BFOQ defense in *Western Air Lines, Inc.* v. *Criswell*, 472 U. S. 400 (1985), this time in the context of the Age Discrimination in Employment Act of 1967 (ADEA). There, we endorsed the two-part inquiry for evaluating a BFOQ defense used by the Court of Appeals for the Fifth Circuit in *Usery* v. *Tamiami Trail Tours, Inc.*, 531 F. 2d 224 (1976). First, the job qualification must not be "so peripheral to the central mission of the employer's business" that no dis-

crimination could be "'reasonably *necessary* to the normal operation of the particular business.'" 472 U. S., at 413. Although safety is *not* such a peripheral concern, *id.*, at 413, 419,[4] the inquiry "'adjusts to the safety factor'"—"'[t]he greater the safety factor, measured by the likelihood of harm and the probable severity of that harm in case of an accident, the more stringent may be the job qualifications,'" *id.*, at 413 (quoting *Tamiami, supra*, at 236). Second, the employer must show either that all or substantially all persons excluded "'"would be unable to perform safely and efficiently the duties of the job involved,"'" or that it is "'"impossible or highly impractical"'" to deal with them on an individual basis. 472 U. S., at 414 (quoting *Tamiami, supra*, at 235 (quoting *Weeks* v. *Southern Bell Telephone & Telegraph Co.*, 408 F. 2d 228, 235 (CA5 1969))). We further observed that this inquiry properly takes into account an employer's interest in safety—"[w]hen an employer establishes that a job qualification has been carefully formulated to respond to documented concerns for public safety, it will not be overly burdensome to persuade a trier of fact that the qualification is 'reasonably necessary' to safe operation of the business." 472 U. S., at 419.

*Dothard* and *Criswell* make clear that avoidance of substantial safety risks to third parties is *inherently* part of both an employee's ability to perform a job and an employer's

---

[4] An example of a "peripheral" job qualification was in *Diaz* v. *Pan American World Airways, Inc.*, 442 F. 2d 385 (CA5), cert. denied, 404 U. S. 950 (1971). There, the Fifth Circuit held that being female was not a BFOQ for the job of flight attendant, despite a determination by the trial court that women were better able than men to perform the "nonmechanical" functions of the job, such as attending to the passengers' psychological needs. The court concluded that such nonmechanical functions were merely "tangential" to the normal operation of the airline's business, noting that "[n]o one has suggested that having male stewards will so seriously affect the operation of an airline as to jeopardize or even minimize its ability to provide safe transportation from one place to another." 442 F. 2d, at 388.

"normal operation" of its business. Indeed, in both cases, the Court approved the statement in *Weeks* v. *Southern Bell Telephone & Telegraph Co.*, *supra*, that an employer could establish a BFOQ defense by showing that "all or substantially all women would be unable to perform *safely and efficiently* the duties of the job involved." *Id.*, at 235 (emphasis added). See *Criswell*, 472 U. S., at 414; *Dothard*, *supra*, at 333. The Court's statement in this case that "the safety exception is limited to instances in which sex or pregnancy actually interferes with the employee's ability to perform the job," *ante*, at 204, therefore adds no support to its conclusion that a fetal-protection policy could never be justified as a BFOQ. On the facts of this case, for example, protecting fetal safety while carrying out the duties of battery manufacturing is as much a legitimate concern as is safety to third parties in guarding prisons *(Dothard)* or flying airplanes *(Criswell)*.[5]

*Dothard* and *Criswell* also confirm that costs are relevant in determining whether a discriminatory policy is reasonably necessary for the normal operation of a business. In *Dothard*, the safety problem that justified exclusion of women from the prison guard positions was largely a result of inadequate staff and facilities. See 433 U. S., at 335. If the cost of employing women could not be considered, the employer there should have been required to hire more staff and restructure the prison environment rather than exclude women. Similarly, in *Criswell* the airline could have been

---

[5] I do not, as the Court asserts, *ante*, at 203, reject the "'essence of the business'" test. Rather, I merely reaffirm the obvious—that safety to third parties is part of the "essence" of most if not all businesses. Of course, the BFOQ inquiry "'adjusts to the safety factor.'" *Criswell*, 472 U. S., at 413 (quoting *Usery* v. *Tamiami Trail Tours, Inc.*, 531 F. 2d 224, 236 (CA5 1976)). As a result, more stringent occupational qualifications may be justified for jobs involving higher safety risks, such as flying airplanes. But a recognition that the importance of safety varies among businesses does not mean that safety is completely irrelevant to the essence of a job such as battery manufacturing.

required to hire more pilots and install expensive monitoring devices rather than discriminate against older employees. The BFOQ statute, however, reflects "Congress' unwillingness to require employers to change the very nature of their operations." *Price Waterhouse* v. *Hopkins*, 490 U. S. 228, 242 (1989) (plurality opinion).

The PDA, contrary to the Court's assertion, *ante*, at 204, did not restrict the scope of the BFOQ defense. The PDA was only an amendment to the "Definitions" section of Title VII, 42 U. S. C. § 2000e, and did not purport to eliminate or alter the BFOQ defense. Rather, it merely clarified Title VII to make it clear that pregnancy and related conditions are included within Title VII's antidiscrimination provisions. As we have already recognized, "the purpose of the PDA was simply to make the treatment of pregnancy consistent with general Title VII principles." *Arizona Governing Comm. for Tax Deferred Annuity and Deferred Compensation Plans* v. *Norris*, 463 U. S. 1073, 1085, n. 14 (1983).[6]

This interpretation is confirmed by the PDA's legislative history. As discussed in *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC*, 462 U. S. 669, 678–679, and n. 17 (1983), the PDA was designed to overrule the decision in *General Electric Co.* v. *Gilbert*, 429 U. S. 125 (1976), where the Court

---

[6] Contrary to the Court's assertion, *ante*, at 204–205, neither the majority decision nor the dissent in *California Federal Savings and Loan Assn.* v. *Guerra*, 479 U. S. 272 (1987), is relevant to the issue whether the PDA altered the BFOQ standard for pregnancy-related discrimination. In that case, the Court held that the PDA did not pre-empt a state law requiring employers to provide leave and reinstatement to pregnant employees. The Court reasoned that the PDA was not intended to prohibit all employment practices that favor pregnant women. *Id.*, at 284–290. The dissent disagreed with that conclusion, arguing that the state statute was pre-empted because the PDA's language that pregnant employees "shall be treated the same for all employment-related purposes" appeared to forbid preferential treatment of pregnant workers. *Id.*, at 297–298. Obviously, the dispute in that case between the majority and the dissent was purely over what constituted *discrimination* under Title VII, as amended by the PDA, not over the scope of the BFOQ defense.

had held that "an exclusion of pregnancy from a disability-benefits plan providing general coverage is not a gender-based discrimination at all." *Id.*, at 136. The PDA thus "makes clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions." *Newport News, supra,* at 684. It does not, however, alter the standards for employer *defenses.* The Senate Report, for example, stated that the PDA "defines sex discrimination, as proscribed in the existing statute, to include these physiological occurrences [pregnancy, childbirth, and related medical conditions] peculiar to women; *it does not change the application of Title VII to sex discrimination in any other way.*" S. Rep. No. 95–331, pp. 3–4 (1977) (emphasis added). Similarly, the House Report stated that "[p]regnancy-based distinctions will be subject to the same scrutiny *on the same terms* as other acts of sex discrimination proscribed in the existing statute." H. R. Rep. No. 95–948, p. 4 (1978) (emphasis added).[7]

In enacting the BFOQ standard, "Congress did not ignore the public interest in safety." *Criswell,* 472 U. S., at 419. The Court's narrow interpretation of the BFOQ defense in this case, however, means that an employer cannot exclude even *pregnant* women from an environment highly toxic to their fetuses. It is foolish to think that Congress intended such a result, and neither the language of the BFOQ exception nor our cases requires it.[8]

---

[7] Even if the PDA *did* establish a separate BFOQ standard for pregnancy-related discrimination, if a female employee could only perform the duties of her job by imposing substantial safety and liability risks, she would not be "similar in [her] ability or inability to work" as a male employee, under the terms of the PDA. See 42 U. S. C. § 2000e(k).

[8] The Court's cramped reading of the BFOQ defense is also belied by the legislative history of Title VII, in which three examples of permissible sex discrimination were mentioned—a female nurse hired to care for an elderly woman, an all-male professional baseball team, and a masseur. See 110 Cong. Rec. 2718 (1964) (Rep. Goodell); *id.,* at 7212–7213 (interpretive memorandum introduced by Sens. Clark and Case); *id.,* at 2720 (Rep.

## II

Despite my disagreement with the Court concerning the scope of the BFOQ defense, I concur in reversing the Court of Appeals because that court erred in affirming the District Court's grant of summary judgment in favor of Johnson Controls. First, the Court of Appeals erred in failing to consider the level of risk avoidance that was part of Johnson Controls' "normal operation." Although the court did conclude that there was a "substantial risk" to fetuses from lead exposure in fertile women, 886 F. 2d 871, 879–883, 898 (CA7 1989), it merely meant that there was a high risk that *some* fetal injury would occur absent a fetal-protection policy. That analysis, of course, fails to address the *extent* of fetal injury that is likely to occur.[9] If the fetal-protection policy insists on a risk-avoidance level substantially higher than other risk lev-

Multer). In none of those situations would gender "actually interfer[e] with the employee's ability to perform the job," as required today by the Court, *ante*, at 204.

The Court's interpretation of the BFOQ standard also would seem to preclude considerations of privacy as a basis for sex-based discrimination, since those considerations do not relate directly to an employee's physical ability to perform the duties of the job. The lower federal courts, however, have consistently recognized that privacy interests may justify sex-based requirements for certain jobs. See, *e. g.*, *Fesel* v. *Masonic Home of Delaware, Inc.*, 447 F. Supp. 1346 (Del. 1978), aff'd, 591 F. 2d 1334 (CA3 1979) (nurse's aide in retirement home); *Jones* v. *Hinds General Hospital*, 666 F. Supp. 933 (SD Miss. 1987) (nursing assistant); *Local 567 American Federation of State, County, and Municipal Employees, AFL–CIO* v. *Michigan Council 25, American Federation of State, County, and Municipal Employees, AFL–CIO*, 635 F. Supp. 1010 (ED Mich. 1986) (mental health workers); *Norwood* v. *Dale Maintenance System, Inc.*, 590 F. Supp. 1410 (ND Ill. 1984) (washroom attendant); *Backus* v. *Baptist Medical Center*, 510 F. Supp. 1191 (ED Ark. 1981) (nursing position in obstetrics and gynecology department of hospital), vacated as moot, 671 F. 2d 1100 (CA8 1982).

[9] Apparently, between 1979 and 1983, only eight employees at Johnson Controls became pregnant while maintaining high blood lead levels, and only one of the babies born to this group later recorded an elevated blood lead level. See *ante*, at 191; 886 F. 2d, at 876–877.

els tolerated by Johnson Controls such as risks to employees and consumers, the policy should not constitute a BFOQ.[10]

Second, even without more information about the normal level of risk at Johnson Controls, the fetal-protection policy at issue here reaches too far. This is evident both in its presumption that, absent medical documentation to the contrary, all women are fertile regardless of their age, see *id.*, at 876, n. 8, and in its exclusion of presumptively fertile women from positions that might result in a promotion to a position involving high lead exposure, *id.*, at 877. There has been no showing that either of those aspects of the policy is reasonably necessary to ensure safe and efficient operation of Johnson Controls' battery-manufacturing business. Of course, these infirmities in the company's policy do not warrant invalidating the entire fetal-protection program.

Third, it should be recalled that until 1982 Johnson Controls operated without an exclusionary policy, and it has not identified any grounds for believing that its current policy is reasonably necessary to its normal operations. Although it is now more aware of some of the dangers of lead exposure, *id.*, at 899, it has not shown that the risks of fetal harm or the costs associated with it have substantially increased. Cf. *Manhart*, 435 U. S., at 716, n. 30, in which we rejected a BFOQ defense because the employer had operated prior to the discrimination with no significant adverse effects.

Finally, the Court of Appeals failed to consider properly petitioners' evidence of harm to offspring caused by lead exposure in males. The court considered that evidence only in its discussion of the business necessity standard, in which it focused on whether *petitioners* had met their burden of proof. 886 F. 2d, at 889–890. The burden of proving that a discriminatory qualification is a BFOQ, however, rests with

---

[10] It is possible, for example, that alternatives to exclusion of women, such as warnings combined with frequent blood testings, would sufficiently minimize the risk such that it would be comparable to other risks tolerated by Johnson Controls.

the employer. See, *e. g.*, *Price Waterhouse*, 490 U. S., at 248; *Dothard*, 433 U. S., at 333. Thus, the court should have analyzed whether the evidence was sufficient for petitioners to survive summary judgment in light of *respondent's* burden of proof to establish a BFOQ. Moreover, the court should not have discounted the evidence as "speculative," 886 F. 2d, at 889, merely because it was based on animal studies. We have approved the use of animal studies to assess risks, see *Industrial Union Dept.* v. *American Petroleum Institute*, 448 U. S. 607, 657, n. 64 (1980), and OSHA uses animal studies in establishing its lead control regulations, see *United Steelworkers of America, AFL–CIO–CLC* v. *Marshall*, 208 U. S. App. D. C. 60, 128, n. 97, 647 F. 2d 1189, 1257, n. 97 (1980), cert. denied, 453 U. S. 913 (1981). It seems clear that if the Court of Appeals had properly analyzed that evidence, it would have concluded that summary judgment against petitioners was not appropriate because there was a dispute over a material issue of fact.

As Judge Posner observed below:

> "The issue of the legality of fetal protection is as novel and difficult as it is contentious and the most sensible way to approach it at this early stage is on a case-by-case basis, involving careful examination of the facts as developed by the full adversary process of a trial. The record in this case is too sparse. The district judge jumped the gun. By affirming on this scanty basis we may be encouraging incautious employers to adopt fetal protection policies that could endanger the jobs of millions of women for minor gains in fetal safety and health.
>
> "But although the defendant did not present enough evidence to warrant the grant of summary judgment in its favor, there is no ground for barring it from presenting additional evidence at trial. Therefore it would be equally precipitate for us to direct the entry of judgment in the plaintiffs' favor . . . ." 886 F. 2d, at 908.

JUSTICE SCALIA, concurring in the judgment.

I generally agree with the Court's analysis, but have some reservations, several of which bear mention.

First, I think it irrelevant that there was "evidence in the record about the debilitating effect of lead exposure on the male reproductive system," *ante*, at 198. Even without such evidence, treating women differently "on the basis of pregnancy" constitutes discrimination "on the basis of sex," because Congress has unequivocally said so. Pregnancy Discrimination Act, 92 Stat. 2076, 42 U. S. C. § 2000e(k).

Second, the Court points out that "Johnson Controls has shown no factual basis for believing that all or substantially all women would be unable to perform safely . . . the duties of the job involved," *ante*, at 207 (internal quotation marks omitted). In my view, this is not only "somewhat academic in light of our conclusion that the company may not exclude fertile women at all," *ibid.*; it is entirely irrelevant. By reason of the Pregnancy Discrimination Act, it would not matter if all pregnant women placed their children at risk in taking these jobs, just as it does not matter if no men do so. As Judge Easterbrook put it in his dissent below: "Title VII gives parents the power to make occupational decisions affecting their families. A legislative forum is available to those who believe that such decisions should be made elsewhere." 886 F. 2d 871, 915 (CA7 1989).

Third, I am willing to assume, as the Court intimates, *ante*, at 208–211, that any action required by Title VII cannot give rise to liability under state tort law. That assumption, however, does not answer the question whether an action *is* required by Title VII (including the BFOQ provision) even if it is subject to liability under state tort law. It is perfectly reasonable to believe that Title VII has *accommodated* state tort law through the BFOQ exception. However, all that need be said in the present case is that Johnson has not demonstrated a substantial risk of tort liability—which is

alone enough to defeat a tort-based assertion of the BFOQ exception.

Last, the Court goes far afield, it seems to me, in suggesting that increased cost alone—short of "costs . . . so prohibitive as to threaten the survival of the employer's business," *ante*, at 210—cannot support a BFOQ defense. See *ante*, at 206. I agree with JUSTICE WHITE's concurrence, *ante*, at 214, that nothing in our prior cases suggests this, and in my view it is wrong. I think, for example, that a shipping company may refuse to hire pregnant women as crew members on long voyages because the on-board facilities for foreseeable emergencies, though quite feasible, would be inordinately expensive. In the present case, however, Johnson has not asserted a cost-based BFOQ.

I concur in the judgment of the Court.