375 S.E.2d 769

**ST. JOHN'S HOME FOR CHILDREN,**
Petitioner,

v.

**The WEST VIRGINIA HUMAN RIGHTS COMMISSION and Kathy Toothman,**
Respondents.

No. 18528.

Supreme Court of Appeals
of West Virginia.

Nov. 23, 1988.

Paul C. Camilletti, Camilletti & Sacco, Wheeling, for petitioner.

Sharon M. Mullens, Sr. Asst. Atty. Gen., Charleston, for respondents.

NEELY, Justice:

St. John's Home is a child care facility in Wheeling which treats emotionally disturbed children referred to it by the West Virginia Department of Human Services. At the time this case arose, St. John's accepted both boys and girls who were housed in separate cottages and employed child care workers and social case workers who were predominantly female.

In March, 1984, the boy population was unusually disruptive and unruly. The boys in residence at that time had beaten up and assaulted many female case workers, had assaulted each other, and had done substantial damage to the physical facilities. A decision was made, therefore, to hire a male case worker to supervise the boys' cottage in the hopes that a male cottage supervisor might achieve a greater degree of control.

When it was determined that a new cottage supervisor was needed for the boys' cottage, Kathy Toothman was the cook at St. John's. On 27 March 1984, while Ms. Toothman was in the kitchen cooking, she mentioned to the executive director her interest in the boys' cottage supervisor position and was told that a male was being sought to supervise the boys' cottage. She replied that that sounded like discrimination to her. The executive director made no further comment and passed on through the kitchen. A male cottage supervisor was eventually hired, and the problem in the boys' cottage was largely eliminated.

Kathy Toothman was hired in August, 1983 and served as the cook throughout the episode of which she complains and until roughly the summer of 1984, when a lack of money required a layoff of several employees. (When Ms. Toothman was laid off, St. John's attempted to have the children do their own cooking in their respective cottages.) The conversation between Ms. Toothman and the executive director lasted about thirty seconds and Ms. Tooth-

man took no further action at St. John's Home to urge her promotion to child care worker, but rather continued her employment as the cook. After her lay off, however, Ms. Toothman filed a complaint with the West Virginia Human Rights Commission for sex discrimination which ultimately resulted in a decision in her favor. We reverse.

St. John's Home for Children is well known throughout West Virginia and has been in existence for over a hundred years. It is an apostolic activity of the Roman Catholic Church, and for many years St. John's was conducted as an orphanage. More recently, however, St. John's has been operated as a recognized and licensed child care facility for the housing and treatment of emotionally and behaviorally disturbed children who are assigned to its care by the West Virginia Department of Human Services. In this regard, St. John's operates under the direct supervision of the West Virginia Department of Human Services, and is a licensed facility, subject to audit by the Department.

At the time this case arose St. John's operating budget was approximately $400,000 per year, about 25 percent of which came directly from the Catholic Church. The balance of St. John's income accrued from per diem allowances paid for the children within its care by the West Virginia Department of Human Services. Boys' and girls' living quarters are segregated, but the population is gender-mixed during daily activities. Population ages are between twelve and eighteen years, although there have been exceptions on each end of this age scale.

At the time Ms. Toothman sought promotion to child care worker the children were attended by child care workers, about 14 in number, virtually always females. An executive director was in charge of supervising St. John's. Visiting psychologists attended to the children, as did social workers, both in-house and retained. In general, the children sent to St. John's were exceptional; they were not routine juvenile delinquency cases. The children were emotionally deprived and suffered from severe behavioral problems. Therefore, St. John's Home was a therapeutic hospice that was attempting difficult work in behavior modification and applied clinical psychology. The facility could house up to 24 patients, but generally had a census of between 14 and 20.

In March, 1984, St. John's Home had serious problems in the boys' cottage. The female child care workers had regularly been assaulted and beaten by the boys and these episodes involved both serious injuries and sexual attacks. The boys also beat one another and regularly did serious property damage. It became obvious to the management of St. John's that a male child care worker might alleviate these problems because in the normal course of things a male would appear to the patients to be stronger, would be less inviting to physical attack, and would be largely immune to sexual assault.

*W.Va.Code,* 5–11–9 [1981] provides:

It shall be an unlawful discriminatory practice, *unless based upon a bona fide occupational qualification,* or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions: ...

(b) For any employer, employment agency or labor organization, prior to the employment or admission to membership, to (1) elicit any information or make or keep a record of or use any form of application or application blank containing questions or entries concerning the race, religion, color, national origin, ancestry, sex or age of any applicant for employment or membership; (2) print or publish or cause to be printed or published any notice or advertisement relating to employment or membership indicating any preference, limitation, specifications or discrimination based upon race, religion, color, national origin, ancestry, sex or age; or (3) deny or limit, through a quota system, employment or membership because of race, religion, color, national origin, ancestry, sex, age, blindness or handicap. [emphasis added]

"A bona fide occupational qualification" is a statutory exception to the general rule in *Code,* 5–11–9 [1981] that race, color, creed, sex, national origin, handicap, or age standing alone is no criterion for employment decisions. In the case before us there could be no clearer "bona fide occupational qualification" than the requirement that a boys' cottage master be male. St. John's Home, far from discriminating on the basis of sex, had employed numerous female child care workers to supervise the boys' cottage and had had disastrous results, one of which was attempted rape.

Supervising violent, aggressive, male adolescents involves protecting the weaker members of the patient community from the stronger ones; furthermore, it also involves protecting suicidal patients from themselves. Close supervision to protect patients from themselves and others is necessarily highly intrusive; it involves not only supervision of the day areas, but also supervision of the lavatories, the hallways, and the sleeping quarters at times when children are in various stages of undress, showering, or attending to their bodily functions.

Although women nurses have traditionally taken care of male patients in hospitals, that is a course of conduct that has come to be widely accepted, partially because distinctive uniforms and nurses' professional demeanor are calculated to mitigate the embarrassment that men feel when undressed in the company of women. Similarly, most (but not all) women seem able to consult male doctors without undue embarrassment for the same reasons. However, a school for disturbed adolescents is not a hospital, and disturbed, aggressive teenage boys are as subject to embarrassment as the general population when a member of the opposite sex intrudes upon them in the lavatory. And, of course, at an even more basic level, a male cottage master does not present the same invitation to sexual assault from large, disturbed, male teenagers that a female cottage master presents.

The exact question before us today has been decided by the Supreme Court of the United States in *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). In *Dothard,* Alabama had a regulation prohibiting the hiring of women as prison guards at the state's maximum security male penitentiaries in "contact position" which required closer physical proximity to inmates. Based on the following facts: (1) the environment of the prison; (2) the potential for inmate assaults on women custodians; (3) the dormitory housing security problems; and, (4) the capacity of a woman to provide security in this setting, the U.S. Supreme Court held that the requirement of being male was a bona fide occupational qualification for the correctional contact position. *Id.,* at 334–337, 97 S.Ct. at 2729–2731. *See also Local 567 American Fed. v. Michigan Council,* 635 F.Supp. 1010 (E.D.Mich.1986) (holding that mental health patients' need for personal services and privacy rights provide the basis for a bona fide occupational qualification); *Brooks v. ACF Industries, Inc.,* 537 F.Supp. 1122 (S.D.W.V.1982) (recognizing that the privacy rights of male employees make sex a bona fide occupational qualification for the janitor who cleans the men's bathhouses); *Reynolds v. Wise,* 375 F.Supp. 145 (N.D.Texas 1974) (holding that women correctional officers could probably be excluded from assignments to dormitories and shake-downs to insure the privacy of inmates); *Backus v. Baptist Medical Center,* 510 F.Supp. 1191 (E.D.Ark.1981), vacated on other grounds, 671 F.2d 1100 (8th Cir.1982) (holding that the requirement that maternity labor and delivery nurses be female was justified by the privacy rights of the obstetrical patients).

Accordingly, the Court concludes that the West Virginia Human Rights Commission erred when it failed to dismiss this complaint on the grounds that being male was a bona fide occupational qualification for supervisor of the boys' cottage. The decision of the West Virginia Human Rights Commission is reversed and judgment is entered here in favor of the appellant, St. John's Home for Children.

REVERSED.