Joseph **HERNANDEZ**, Plaintiff,

v.

**UNIVERSITY OF ST. THOMAS, Defendant.**

No. 3–90–36.

United States District Court, D. Minnesota, Third Division.

June 16, 1992.

Thomas L. Garrity, Minneapolis, Minn., for plaintiff.

Phyllis Karasov, St. Paul, Minn., for defendant.

## MEMORANDUM AND ORDER

RENNER, District Judge.

### I.

On March 20, 1992, the Court heard Plaintiff Joseph Hernandez's motion for summary judgment on the grounds that defendant has not raised a genuine issue that sex is a bona fide occupational qualification for custodial work in a women's dormitory. The Court orally announced its ruling on the motion during the hearing, but the Court now issues this Memorandum and Order to clarify the basis for the ruling.

Plaintiff Joseph Hernandez is a 72 year old Hispanic male who works for the defendant University of St. Thomas as a Building Service worker. He has held this position since February of 1977. For almost six years, plaintiff worked as the custodian in a women's dormitory, Dowling Hall.

In January 1988, the University reorganized its entire custodial operations pursuant to the recommendations of a comprehensive study produced by a consulting firm. The University then adopted a new rule that those dormitories in which the communal bathrooms are separated from sleeping quarters by public hallways could be serviced only by custodians of the same sex as the residents. The University had previously followed such a policy from the time it first admitted women in 1977 until 1982. Although the report of the consulting firm did not expressly call for a same-sex policy, the University maintains that it was necessary to adopt this rule in order to meet other recommendations in the report.

Hernandez bid for his position in Dowling Hall. The University did not award him this assignment, so he bid, under protest, for a "police/floater" position. He now holds a position in a dormitory where the same-sex policy is not in effect, because there are no communal bathrooms.

This is the Court's third journey to the western end of Summit Avenue. The University's first motion for summary judgment was heard on December 3, 1990. The Court dismissed plaintiff's union from the lawsuit and granted summary judgment for the University on claims of age and race discrimination as well as claims under 42 U.S.C. § 1981.

However, the Court denied defendant's motion for summary judgment on the claim of sex discrimination under federal and Minnesota statutes. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.;* Minn.Stat. §§ 363.01 *et. seq..* In doing so, the Court ruled that plaintiff has established a prima facie case of sex discrimination and raised a genuine issue that the University has failed to articulate a basis for the reassignment other than sex discrimination.

The University brought a second summary judgment motion on the issues of whether sex discrimination has occurred and whether sex is a bona fide occupational qualification ("BFOQ"). The Court denied this motion on April 29, 1991.

In April of 1991, plaintiff attempted to raise a cross-motion for summary judgment, but the Court refused to hear this motion because plaintiff had failed to give

adequate notice under Local Rule 7.1(b). Plaintiff has now filed a proper motion for summary judgment, arguing that the University cannot raise a genuine issue of fact that sex is a BFOQ.

## II.

At the outset, the parties dispute what elements a defendant must prove to establish a BFOQ based on privacy. Section 703(e)(1) of Title VII provides:

[I]t shall not be an unlawful employment practice for an employer to hire and employ employees ... on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise.

42 U.S.C. § 2000e–2(e)(1). In *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Johnson Controls, Inc.,* —— U.S. ——, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), the Supreme Court considered whether a battery maker could exclude fertile females from certain jobs to protect the health of fetuses. In this context of safety-based BFOQ's, the Supreme Court ruled that:

[I]n order to qualify as a BFOQ, a job qualification must relate to the "essence," ... or to the "central mission of the employer's business."

*Id.,* 111 S.Ct. at 1205.

The University maintains that the "essence of the business" test does not apply when the justification for an asserted BFOQ is privacy. No federal courts have published opinions addressing this issue since the decision in *Johnson Controls.* Defendant's argument is based on Note 4 of the majority's opinion in *Johnson Controls,* which states:

The concurrence predicts that our reaffirmation of the narrowness of the BFOQ defense will preclude considerations of privacy as a basis for sex-based discrimination ... We have never addressed privacy-based sex discrimination and shall not do so here because the sex-based discrimination at issue today does not involve the privacy interests of Johnson Control's customers. Nothing in our discussion of the "essence of the business test," however, suggests that sex could not constitute a BFOQ when privacy interests are implicated.

*Id.,* at 1205.

The University interprets this as implying that a different test governs privacy cases. However, the Court construes this note as suggesting that protecting privacy could be central to the mission of an employer.

In a passage analyzing earlier precedents, *Johnson Controls* explains:

Third-party safety considerations properly entered into the BFOQ analysis in *Dothard* [*v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) ] and [*Western Air Lines, Inc. v.*] *Criswell* [472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985) ] because they went to the core of the employee's job performance. Moreover, that performance involved the central purpose of the enterprise. *Dothard,* 433 U.S., at 335 [97 S.Ct. at 2729–30] ... ("The essence of a correction counselor's job is to maintain prison security"); *Criswell,* 472 U.S., at 413 [105 S.Ct. at 2751] ... (the central mission of the airline's business was the safe transportation of its passengers).

*Johnson Controls,* 111 S.Ct. at 1206.

■ It follows that privacy considerations properly enter into the BFOQ analysis where they go to the core of an employee's job performance, and where that performance is involved in the central purpose of the enterprise.

In cases preceding *Johnson Controls,* courts have found privacy-based BFOQ's where: (1) legitimate privacy rights would be violated by hiring members of one sex, and (2) there are no reasonable alternatives to a sex-based policy. *Norwood v. Dale Maintenance System, Inc.,* 590 F.Supp. 1410 (N.D.Ill.1984); *Brooks v. ACF Industries, Inc.,* 537 F.Supp. 1122 (S.D.W.Va. 1982); *Backus v. Baptist Medical Center,*

510 F.Supp. 1191 (E.D.Ark.1981) vacated as moot, 671 F.2d 1100 (8th Cir.1982).

The concept that alternatives are relevant to whether sex is a BFOQ when privacy is at stake remains valid, but the formulation of the appropriate test must reflect *Johnson Controls.* To establish that sex is a BFOQ because of privacy considerations, a defendant must show a factual basis for believing that an intrusion on legitimate privacy interests is an essential part of the employee's job and that any alternative to a sex-based policy would undermine the central mission of the enterprise.

Hernandez contends that the University must be able to "show that it had a factual basis to believe that opposite sex custodians could not perform the essence of the job, at the *time* it *implemented* the policy." Plaintiff's Reply Memorandum, at p. 2. The Court does not agree. Although the University must now show that it has a factual basis for believing that sex is a BFOQ, it does not need to show that, at the time it implemented the same-sex policy, it could have proven that sex was a BFOQ.

Hernandez also maintains that the University needs to demonstrate an actual loss of dormitory residents to establish a BFOQ. *See United States E.E.O.C. v. Sedita,* 755 F.Supp. 808 (N.D.Ill.1991). The Court rejects this view. Qualitative issues, as well as quantitative results, can affect the essence of a business. *Chambers v. Omaha Girls Club, Inc.,* 834 F.2d 697 (8th Cir.1987) (finding a BFOQ where a girls club terminated an unmarried employee who became pregnant).

### III.

To defeat this motion for summary judgment, the University must show that there is a genuine issue of material fact that sex is a BFOQ for custodial work at Dowling Hall. Fed.R.Civ.P. 56. The BFOQ defense inherently raises factual issues. In *Johnson Controls,* the justices of the Supreme Court were unanimous in recognizing that summary judgment was inappropriate on the facts of that case.

The two published decisions involving same-sex custodian policies followed trials on the merits. *See Norwood v. Dale Maintenance System, Inc.,* 590 F.Supp. at 1419 (N.D.Ill.1984); *Brooks v. ACF Industries, Inc.,* 537 F.Supp. 1122 (S.D.W.Va.1982).

The University maintains that the only way to efficiently clean the dormitories while respecting the privacy interests of the residents is to require custodians to be of the same sex as the residents of the dormitory. It has submitted several affidavits to support its position.

Several of these affidavits are rife with hearsay. The Court has not considered such evidence. Fed.R.Civ.P. 56(e). In particular, the Court excludes statements by University officials that purport to repeat the content of students' complaints about building service workers.

Other statements are too conclusory to be of use. *United States E.E.O.C. v. Sedita,* 755 F.Supp. 808 (N.D.Ill.1991). For example, the Court does not rely on the statement of the University's Vice–President Dr. Michael Sullivan to the effect that the same-sex policy is the only rational and efficient cleaning system which would protect the privacy rights of the students.

Nonetheless, many admissible statements contained in these affidavits raise genuine issues of material fact. As the custodial supervisor, Thomas Dale personally observed the efficiency and quality of the cleaning of Dowling Hall. He testified that male custodians who formerly cleaned Dowling Hall lost time waiting to enter bathrooms while female residents used them. Male building service workers lost time both at the beginning of the day during the major cleanup, and again at the end of the shift prior to touch up cleaning. Work could not begin until after 10:00 A.M., because of a general prohibition on males in the dormitory until that time. Dale also states that female residents often interrupted cleaning by using the bathroom while work was in progress. Dale concludes that these delays often prevented male custodians from completing their assignments by the end of the day. For these reasons, Dale maintains it is more

efficient for women to service women's dormitories.

Dale also testifies that alternatives to the same-sex policy are flawed. Closing bathrooms during cleaning would cause residents to use other bathrooms. According to Dale, this would exceed the capacity in those alternative facilities.

The affidavits of two female dormitory custodians parallel Dale's conclusions concerning the improved efficiency of the same-sex policy and the lack of capacity to close bathrooms during cleaning.

Dr. Phillip Haber, who has a doctoral degree in rehabilitative psychology, has visited Dowling Hall and reached the opinion that the same-sex policy is reasonably necessary to the normal operation of the dormitory and protects the privacy interests of the dormitory residents. He also substantiates his opinion that alternatives are unreasonable, contending that they would lead to unnecessary worry on the part of female residents.

Several St. Thomas officials have testified that a comprehensive evaluation of the University's custodial system occasioned recommendations which could not be put into effect without instituting the same-sex policy, although the evaluation itself did not call for the policy. The most convincing testimony to this effect comes from the consultant who conducted this efficiency analysis, Lewis Culpepper.

The University has also submitted affidavits of four female students who have lived in Dowling Hall. They testify that when the male custodians worked in the dormitory, the closing of bathrooms led to inconveniences and embarrassing situations that infringed their privacy. They also testified that a peeping incident heightened concern about the presence of unescorted males in the dormitory.

Finally, there is testimony from University officials and a student to the effect that there is a special concern for privacy and some degree of separation of the sexes because of the religious nature of the University.

Taken together, all of these statements seem to raise a genuine issue that the University has a factual basis for believing that intrusions on legitimate privacy interests are an essential part of maintaining a college dormitory with communal bathrooms, and that any alternatives to a sex-based policy would significantly decrease the efficiency and the quality of custodial operations and would still fail to satisfactorily address the privacy concerns. At some point, a high degree of added cost, decreased cleanliness, or intrusion on privacy could undermine the central mission of the enterprise.

Plaintiff's submissions throw doubt on the validity of the assertions in the affidavits of the defendant. Indeed, the Court has previously ruled that plaintiff has raised a factual issue that sex is not a BFOQ. The fact most damaging to defendant's case is that the University operated women's dorms with male custodians for over five years. However, it is still possible that a policy which the University implemented and then rejected undermined the central mission of the enterprise.

## ORDER

Based upon the arguments of counsel, all facts, files, and records herein, the Court HEREBY ORDERS that plaintiff's motion for summary judgment is DENIED.