452 S.E.2d 463

**Phyllis GIBSON, Barbara Ellis Vance, Marjorie Elliott, Theresa Chinn and Ruth Waters, Appellants Below, Appellants,**

v.

**WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, DIVISION OF HEALTH, Appellee Below, Appellee.**

No. 21919.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 20, 1994.

Decided Dec. 8, 1994.

Larry Harless, Charleston, for appellants.

Robert H. Beatty, Jr., Asst. Atty. Gen., Charleston, for appellee.

WORKMAN, Justice:

Phyllis Gibson, Barbara Vance, Marjorie Elliott, Theresa Chinn, and Ruth Waters (hereinafter "Appellants") appeal from the April 1, 1993, order of the Circuit Court of Cabell County, affirming an adverse decision on their gender discrimination grievance before the West Virginia Education and State Employees Grievance Board ("Grievance Board"). After examining the record in this matter, we affirm the decision of the court below.

On June 30, 1990, the Appellants were laid off[1] by their employer, the West Virginia Division of Health ("DOH"), from employment at the Huntington State Hospital (hereinafter referred to as "HSH" or the "hospital").[2] Each of the Appellants had been employed as health service workers, a position which involves providing daily care for hospital patients. Before effecting the layoffs, the DOH made a decision to retain the twenty-three most senior male and the twenty-three most senior female health service workers.[3]

Each of the Appellants filed grievances alleging discriminatory treatment in connection with the layoffs pursuant to the Grievance Procedure for State Employees. *See* W.Va.Code §§ 29–6A–1 to –11 (1992). The Appellants were denied relief at level I and level II of each of their respective grievance proceedings. Their grievances were consolidated for a level III hearing and their requested relief was once again denied.[4] On December 10, 1990, an evidentiary hearing was held before an ALJ of the Grievance Board. By decision dated February 27, 1991, the Grievance Board ruled in favor of the DOH. Appellants then sought relief

---

1. The layoffs were prompted by the fact that the Huntington State Hospital was under a court-ordered consent decree to downsize by closing Unit III—the long-term care unit. *See E.H. v. Matin,* 189 W.Va. 445, 432 S.E.2d 207 (1993). The closing of this unit resulted in a fifty percent reduction of the hospital census which in turn necessitated a reduction in force.

2. The Appellants were each recalled to their respective positions as health service workers at HSH by September 1, 1991.

3. At the time of the layoffs, the Appellants' seniority was as follows:

| | |
|---|---|
| Phyllis J. Gibson | 10 years, 11 months |
| Barbara E. Vance | 11 years, 9 months |
| Marjorie Elliott | 12 years, 2 months |
| Theresa Chinn | 10 years, 6 months |
| Ruth Waters | 10 years, 2 months |

4. Appellants sought "to be made whole in every way, to be returned to [their] job[s] at once."

from the Circuit Court of Cabell County. The circuit court, by order dated March 31, 1991, upheld the ruling of the Grievance Board, finding the ruling neither contrary to the laws of this State, nor arbitrary, capricious, discriminatory, or unreasonable.

Appellant argues that the DOH failed to comply with the seniority mandate of West Virginia Code § 29–6–10(5) (1992) in effecting the layoffs. That provision states:

> For layoffs by classification for reason of lack of funds or work, or abolition of a position, or material changes in duties or organization, or any loss of position because of the provisions of this subdivision and for recall of employees so laid off, consideration shall be given to an employee's seniority as measured by permanent employment in the classified service or a state agency. In the event that the agency wishes to lay off a more senior employee, the agency must demonstrate that the senior employee cannot perform any other job duties held by less senior employees within that agency in the job class or any other equivalent or lower job class for which the senior employee is qualified: Provided, That if an employee refuses to accept a position in a lower job class, such employee shall retain all rights of recall as hereinafter provided.

W.Va.Code § 29–6–10(5). Whereas all of the Appellants had more than ten years seniority at HSH at the time of the layoffs, of the twenty-three male health service workers who were retained in lieu of Appellants, twenty-one of them had between one to seven complete years of seniority.[5]

In response to Appellants' seniority claim, the DOH maintains that its actions were proper and in accordance with the language of West Virginia Code § 29–6–10(5). To support its position, the DOH cites the language included in that provision which states:

> In the event that the agency wishes to lay off a more senior employee, the agency must demonstrate that the senior employee cannot perform any other job duties held by less senior employees within that agency in the job class or any other equivalent or lower job class for which the senior employee is qualified....

W.Va.Code § 29–6–10(5). The DOH further references the adoption of an administrative rule by the State Division of Personnel (hereinafter referred to as "Rule 8.2(f)"), which provides that "Selective Certification by gender is permissible if the request with a justification in writing is approved by the Director of Personnel. Justification must clearly show that only employees of the required gender can perform the duties." 10 W.Va.C.S.R. § 143–1–8.2(f).

Under authority of Rule 8.2(f), the DOH applied for a bona fide occupational qualification ("BFOQ") on April 1, 1986. The specific BFOQ sought was permission to hire from the Civil Service[6] register only qualified male applicants for the classified position of health service worker for the hospital. The impetus for seeking such a BFOQ was mounting concerns over patient privacy issues.[7] On June 17, 1986, the West Virginia Human Rights Commission issued, pursuant to West Virginia Code § 29A–4–1 (1993), a non-binding declaratory ruling granting the requested BFOQ. Following the granting of the BFOQ, the DOH was then permitted to request the development of an all-male register for purposes of hiring health service workers at the hospital. On July 11, 1986, the acting director of the Division of Personnel approved the classifications of health ser-

---

5. Two of the retained male health service workers had in excess of twenty years of seniority.

6. With the abolishment of the civil service system in 1989, it is now referred to as a merit system. *See* W.Va.Code § 29–6–9 (1992).

7. The record reveals that

> [t]he reason for requesting the BFOQ in the first place was to attempt to keep the patients of State operated facilities from 'adverse psychological harm caused by embarrassment or degradation from being observed by members of the opposite sex while dressing, bathing and/or toileting or other private activities.' Preserving an appropriate ratio of male staff to male patients is an important factor to preserving the personal dignity, autonomy, and individuality of patients at this hospital.

This statement was made in a memorandum written by a DOH administrator dated June 15, 1990.

vice worker I and II based on gender.[8] According to the DOH, the granting of the BFOQ created separate and distinct classes, based upon gender, within the category of health service workers I and II for the hospital.

The DOH explained its actions with regard to the layoff by stating that if a layoff made strictly according to seniority only was implemented, all but two male health service workers would be laid off from the hospital. Based on its conclusion that such a seniority-based layoff would have a devastating effect on the hospital's commitment to preserving the privacy rights of its male patients and would be antithetical to its prior request and approval of a BFOQ based on gender, the DOH asked the Division of Personnel to seek approval from the State Personnel Board for a reduction in force consistent with the BFOQ. Following the receipt of such approval, the DOH implemented a gender-based work force reduction which resulted in the layoffs of the least senior hospital employees within the classifications of health service worker I and II.

■ We have previously recognized in *St. John's Home For Children v. West Virginia Human Rights Commission,* 180 W.Va. 137, 375 S.E.2d 769 (1988), that

It is within the 'bona fide occupational qualification' exception to *W.Va.Code,* 5–11–9 [1981] to limit consideration of applicants for the position of child care worker to the male sex when the job entails close, intrusive supervision of aggressive, emotionally disturbed, violent, male adolescents housed in the boys' cottage of a school for delinquent children.

*Id.,* Syllabus. With regard to the issue of privacy as a justification for a sex-based BFOQ, we stated in *St. John's,*

Supervising violent, aggressive, male adolescents involves protecting the weaker members of the patient community from the stronger ones; furthermore, it also involves protecting suicidal patients from themselves. Close supervision to protect patients from themselves and others is necessarily highly intrusive; it involves not only supervision of the day areas, but also supervision of the lavatories, the hallways, and the sleeping quarters at times when children are in various stages of undress, showering, or attending to their bodily functions.

*Id.* at 139, 375 S.E.2d at 771.

■ It is well-established that sex can be an appropriate criterion for seeking and utilizing a BFOQ. *See Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977) (recognizing that requiring certain prison guards to be male was a BFOQ for the correctional contact position). In a more factually analogous case, female workers at a state mental health institution challenged a certification system whereby female workers were laid off differently from male workers within the same classification. *See Local 567 American Fed'n of State, County and Mun. Employees v. Michigan Council 25,* 635 F.Supp. 1010 (E.D.Mich.1986). In finding that "[t]he privacy rights of mental health patients or residents in state mental health facilities can justify a BFOQ to provide for same-sex personal hygiene care[,]" the court noted that " 'We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.' " *Id.* at 1013 (quoting *York v. Story,* 324 F.2d 450 (9th Cir.1963), *cert. denied,* 376 U.S. 939, 84 S.Ct. 794, 11 L.Ed.2d 659 (1964)).

The DOH argues, and we agree, however that the issue of the appropriateness of a sex-based BFOQ is not properly before this Court. At the level IV hearing, Appellants' counsel stated that "[w]e're not challenging this BFOQ." The ALJ followed up this response with the inquiry, "So you're saying actually, if a BFOQ is available to Respondent [the hospital], they didn't do anything improperly?" And in response to this, Appellants' counsel then stated, "We're arguing that the layoff violated the *W.Va.Code* 29–6–

---

8. Health service worker I refers to male employees whereas health service worker II is the classification for female employees.

10–5 [sic]." Based on these responses from Appellants' counsel, it appears that the DOH deemed it unnecessary to introduce evidence at length regarding the issuance of the BFOQ.[9]

 Appellants now wish to challenge the issuance of the BFOQ, whereas they previously did not. By their own choice below, however, Appellants have limited their argument to an assertion that West Virginia Code § 29–6–10(5) prevented the layoffs from being handled in any way other than that set forth statutorily. This approach prompted the ALJ to observe:

> At the Level IV hearing Grievants were granted opportunity to allege that, if a BFOQ was available, such was improperly implemented, but their representative declined. Such a limiting of the issues was rather odd since he [Appellants' counsel] had been provided a copy of *Higginbotham*[10] prior to hearing and given opportunity to study it, and its pertinence to this case should have been apparent.

Given the failure of Appellants to protest the justification for a BFOQ at the level IV hearing, we conclude that the Appellants effectively waived their right to challenge the BFOQ, and are accordingly barred from raising this issue at the appellate level. *See Smith v. Smith,* 187 W.Va. 645, 650, 420 S.E.2d 916, 921 n. 5 (1992) (recognizing that "Supreme Court will not decide nonjurisdictional questions which have not been raised in the proceedings below").

 Based on this Court's holding in *St. John's* combined with the failure of Appellants to object to the BFOQ at the level IV hearing, we conclude that the circuit court committed no error in upholding the decision of the Grievance Board. The decision of the Grievance Board properly recognized that the implementation of a bona fide occupational qualification, when not challenged, permits the retention of less senior employees in connection with a reduction in force notwithstanding the existence of a statutory seniority system which would otherwise prevent the layoff of more senior employees.

Based on the foregoing, the decision of the Circuit Court of Cabell County is hereby affirmed.

Affirmed.

BROTHERTON, Chief Justice, did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

---

9. Appellants argue that the DOH failed to present evidence at the level IV hearing to demonstrate, inter alia, that no reasonable alternatives existed to its gender-based classifications. Specifically, Appellants contend that the DOH failed to prove that alternatives such as rearranging the work schedule of the health service workers so as to permit the availability of male workers for those patients requesting such workers was not a viable option. Appellants cite *United States v. Gregory,* 818 F.2d 1114 (4th Cir.1987) for the proposition that the DOH had the burden of establishing "why it cannot reasonably rearrange job responsibilities" and "why it could not accommodate, through the reasonable modification of the facility and job functions" with regard to the availability of the BFOQ defense. *Id.* at 1118.

10. The *Higginbotham* decision, issued by the Grievance Board on February 27, 1989, concerned the violation of statutory seniority requirements for educational employees through the release of a more senior female aide in favor of the retention of a junior in seniority male aide. That decision held that "[w]hen a bona fide occupational qualification for a certain position requires the retention of the most junior employee in a classification, a board of education may properly release the next junior employee in that classification under a reduction-in-force action." *Higginbotham v. Putnam Co. Bd. of Educ.,* W.Va. Educ. & Public Employees Grievance Board, No. 40–88–069 at 7 (Feb. 27, 1989). The significance of the *Higginbotham* decision to the case at bar, which Appellants' counsel apparently failed to comprehend, is that the existence of a properly-approved BFOQ can justify the implementation of a reduction in force which does not follow the letter of a statutory seniority system.