594 S.E.2d 616

**Michael SLIVKA, Plaintiff Below, Appellant,**

v.

**CAMDEN–CLARK MEMORIAL HOSPI-TAL AND PATRICIA WILLIAMS, Defendants Below, Appellees.**

**No. 31404.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 13, 2004.

Decided Feb. 19, 2004.

Concurring Opinion of Justice Starcher March 29, 2004.

Starcher, J., concurred with opinion.

Maynard, C.J., concurred in part and dissented in part with opinion.

**110**

Walt Auvil, The Employment Law Center, PLLC, Parkersburg, West Virginia, Attorney for the Appellant.

Kevin A. Nelson, Jill Sinatra, Constance H. Weber, Kay Casto & Chaney, LLC, Charleston, West Virginia, Attorneys for the Appellees.

Patricia H. Stiller, Molly A. Superfesky, Law Office of Stiller & Mooney, PLLC, Morgantown, West Virginia, Attorneys for Amicus Curiae, The West Virginia Employment Lawyers Association.

Darrell V. McGraw, Jr., Attorney General, Paul R. Sheridan, Deputy Attorney General, Jonathan L. Matthews, Assistant Attorney General, Charleston, West Virginia, Attorneys for Amicus Curiae, The West Virginia Human Rights Commission.

ALBRIGHT, Justice:

Through this action, Michael Slivka, plaintiff below, appeals the September 24, 2002, order of the Circuit Court of Wood County granting summary judgment for the defendant below and appellee herein, Camden–Clark Memorial Hospital (hereinafter referred to as "Camden–Clark"). The complaint filed by Mr. Slivka in the circuit court alleged that Camden–Clark's policy of not hiring male nurses in the obstetrics unit of the hospital constituted gender discrimination in violation of the West Virginia Human Rights Act (hereinafter referred to as "Act"). *See* W.Va.Code §§ 5–11–1 to 21 (Repl.Vol. 2002). The lower court ruled that Camden–Clark had demonstrated that the gender requirement was a bona fide occupational qualification (hereinafter referred to as "BFOQ") within the statutory exception to the Act's general prohibition of discrimination in hiring practices. Following due consideration of the record as submitted, the briefs of the parties and amici,[1] and arguments before this Court,[2] the judgment of the court below is reversed and the case is remanded for further development.

### I.  Factual and Procedural Background

Mr. Slivka is a registered nurse (hereinafter referred to as "RN" or "nurse") whose source of professional registration as well as residence is the state of Ohio. The record reflects that Mr. Slivka has held various

---

1. We recognize and appreciate the role played by the West Virginia Employment Lawyers Association and the West Virginia Human Rights Commission as amicus curiae in this case.

2. By December 17, 2003, order of this Court, the West Virginia Human Rights Commission was granted leave to participate with the parties in oral argument.

nursing positions since becoming an RN in 1991, several of which have involved obstetrical duties. Mr. Slivka's work at Good Samaritan Medical Center in Zanesville, Ohio between 1993 and 1995 included being present in the delivery room to assist with deliveries of infants who would later require his care in the intensive care nursery. Similarly, his position with Marietta Memorial Hospital in Marietta, Ohio,[3] has been as a staff nurse in the obstetrical department, where he received training to work in the three distinct areas of the department, namely, labor and delivery, postpartum and nursery. In 2001, Mr. Slivka accepted a full-time position with Genesis Healthcare in Zanesville, Ohio in the intensive care nursery.[4]

Before going to work for Genesis Healthcare, Mr. Slivka had applied for a position as a staff RN in the obstetrical department of Camden–Clark[5] in January 2000. While it is unsettled as to whether an offer of employment was actually made, it is clear that Camden–Clark informed Mr. Slivka that although male nurses were employed in other departments of the hospital, male nurses had never been hired to work in its obstetrical department due to concerns for patient privacy, staffing and quality of care.[6]

In response to the hospital's explanation for refusing to consider him for employment in the obstetrical unit, Mr. Slivka filed suit in the Wood County Circuit Court on January 16, 2001. Following discovery, Camden–Clark moved for summary judgment, after which Mr. Slivka filed a like motion. A hearing on the motions was held on September 12, 2002. Thereafter, the lower court granted summary judgment to Camden–Clark through its September 24, 2002, order in which it was stated:

2. The Court finds that, based upon the privacy concerns of the hospital's patients and their families, as well as factual evidence that the presence of male nurses in the obstetrics ward has previously caused, and would continue to cause, conflicts among patients, doctors, and hospital staff, Camden–Clark Hospital has factually established sufficient grounds to demonstrate that it is a permissible BFOQ in the hiring of obstetrical ward nurses that they be females.

3. A review of the applicable case law demonstrates that all courts that have addressed the issue of whether sex-based hiring may be a BFOQ for obstetrical ward nurses have found that it may be a bona fide occupational qualification that said nurses be females. Despite the court's request at the hearing held in this matter, plaintiff's counsel has been unable to provide the Court with any contrary authority. Accordingly, the Court finds that the legal authorities agree that sex based hiring of obstetrical ward nurses may be a BFOQ.

Mr. Slivka petitioned this Court to appeal the summary judgment order, which was granted by order dated June 18, 2003.

## II. Standard of Review

Our examination of the decision of the lower court is guided by previously announced principles applicable to motions for summary judgment. As pointed out in syllabus point one of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994) "[a] circuit court's entry of summary judgment is reviewed *de novo*." We have further held that "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clari-

3. Mr. Slivka first began work at Marietta Memorial on a full-time basis in 1998. During his deposition, Mr. Slivka explained that he remained employed at the Marietta Hospital on an on-call basis after he accepted full-time employment with Genesis Healthcare.

4. Mr. Slivka also was employed with Morgan Home Health Agency and later by Fairfield Visiting Nurses Association, both located in Ohio, at which he was hired as a mother/child nurse to perform home visits of postpartal mothers. Nevertheless, according to Mr. Slivka he typically provided in-home care to geriatric patients because of the on-call nature of his employment with these agencies. The positions essentially were relied on as second jobs.

5. Camden–Clark is situated in Parkersburg, West Virginia.

6. It is asserted that the practice of exclusively hiring female nurses in the obstetrical department has been in effect for over twenty years.

fy the application of the law." Syl. Pt. 3, *Aetna Cas. & Sur. Co. v. Federal Ins. Co. of N.Y.*, 148 W.Va. 160, 133 S.E.2d 770 (1963). It logically flows that "such judgment must be denied if there is a genuine issue as to a material fact." *Id.* at Syl. Pt. 4, 133 S.E.2d 770.

We have heretofore noted that "[s]ummary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, such as where the nonmoving party has failed to make a sufficient showing on an essential element of the case that it has the burden to prove." 192 W.Va. at 190, 451 S.E.2d at 756, Syl. Pt. 4. In the course of such review, this Court construes the facts " 'in a light most favorable to the losing party [.]' " *Alpine Prop. Owners Ass'n, Inc. v. Mountaintop Dev. Co.*, 179 W.Va. 12, 17, 365 S.E.2d 57, 62 (1987) quoting and citing *Masinter v. WEBCO Co.*, 164 W.Va. 241, 242, 262 S.E.2d 433, 435 (1980). Mindful of these precepts, we turn to the issue before us to determine whether there was adequate relevant evidence to substantiate a BFOQ and thus warrant the entry of summary judgment for Camden–Clark.

### III. Discussion

As this Court has noted on prior occasion, the person alleging discriminatory employment practices bears the initial burden to prove by a preponderance of evidence a prima facie case of discrimination. See Syl. Pt. 3, *Shepherdstown Volunteer Fire Dept. v. State ex rel. State of West Virginia Human Rights Comm'n*, 172 W.Va. 627, 309 S.E.2d 342 (1983).[7] Once the initial showing is made, the burden of persuasion shifts to the employer. In instances of disparate treatment,[8] as we have in the case before us, the only statutory defense on which an employer can rely to support its facially discrim-

inatory policy is the BFOQ exception. As stated in the Act:

It shall be an unlawful discriminatory practice, unless based on a bona fide occupational qualification, or except where based upon applicable security regulations established by the United States or the state of West Virginia or its agencies or political subdivisions:

(1) For any employer to discriminate against an individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment if the individual is able and competent to perform the services required....

W.Va.Code § 5–11–9 (1998) (Repl.Vol.2002).

At the heart of the dispute before us is what are the elements a defendant must prove to establish a gender-based BFOQ when privacy interests are involved. We have addressed the Act's BFOQ exception only twice before. In neither case did we set out a test or guidelines for evaluating a BFOQ claim. In the syllabus of *St. John's Home for Children v. West Virginia Human Rights Commission*, 180 W.Va. 137, 375 S.E.2d 769 (1988), we found that being male was a BFOQ for the position of child care worker at a residential facility for violently aggressive, emotionally disturbed adolescent males. This conclusion was reached after finding: (1) the existence of a high risk of sexual assault and serious physical injury for female workers based on past experience at the facility, and (2) the likelihood that residents would be embarrassed by a member of the opposite sex fulfilling the necessary supervisory duties of observing the boys "in various stages of undress, showering, or attending to their bodily functions." *Id.* at 139, 375 S.E.2d at 771. We then noted the factual similarity with *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), a case involving correctional officers

---

7. In cases such as the one at bar, the initial burden is simplified because the employer has admitted the discriminatory practice. As one court has observed, "to require a plaintiff to establish a *prima facie* case of sex discrimination in the face of an assertion of a bfoq defense would be redundant." *Norwood v. Dale Maintenance System, Inc.*, 590 F.Supp. 1410, 1415 n. 3 (N.D.Ill.1984).

8. A different analysis is undertaken when a case involves indirect discrimination, often referred to as a disparate impact case. *See e.g. Wheeling–Pittsburgh Steel Corp. v. Rowing*, 205 W.Va. 286, 517 S.E.2d 763 (1999).

at a state maximum security prison, and summarily concluded St. John's Home's discriminatory practice was a BFOQ exception to the Act's ban on discrimination. In a later case, *Gibson v. West Virginia Department of Health and Human Resources*, 192 W.Va. 372, 452 S.E.2d 463 (1994), we recognized that gender could be a criterion for a BFOQ even though that issue was not then properly before the Court as it had not been preserved below by the appellant. Because these earlier cases did not analyze the BFOQ exception or set out a test to apply in subsequent circumstances, we first must establish the means to evaluate when a BFOQ exception to a discriminatory employment practice may be acceptable in order to determine whether summary judgment was appropriately granted in this case.

When faced with issues requiring us to interpret the provisions of the Act, we have consistently held that such cases "are governed by the same analytical framework and structures developed under Title VII [of the Civil Rights Act of 1964], at least where our statute's language does not direct otherwise." *Barefoot v. Sundale Nursing Home*, 193 W.Va. 475, 482, 457 S.E.2d 152, 159 (1995). The BFOQ provision of the Act clearly does not direct otherwise. Moreover, the wording of the BFOQ exception in the federal statute and our Act are quite similar, with the pertinent part of the federal law providing:

**(a) Employer practices**

It shall be an unlawful employment practice for an employer-

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin . . . .

.    .    .    .    .

(e) Businesses or enterprises with personnel qualified on basis of religion, sex, or national origin . . .

Notwithstanding any other provision of this subchapter, (1) it shall not be an un-lawful employment practice for an employer t hire and employ employees . . . on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise . . . .

Title 42 U.S.C. § 2000e–2 (1991).

Upon examining the BFOQ exception in Title VII of the Civil Rights Act, the United States Supreme Court has concluded that an employer asserting a BFOQ defense faces a difficult burden in light of the public policy furthered by the enactment. As the high court observed, the BFOQ exception is "meant to be an extremely narrow exception to the general prohibition of discrimination on the basis of sex." *Dothard v. Rawlinson*, 433 U.S. 321, 334, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). Under consideration in *Dothard* was a state penitentiary's policy for excluding females as correctional officers having direct contact duties with the general inmate population, which included sex offenders prone to violence. Borrowing from lower federal court decisions, the Supreme Court in *Dothard* adopted a two-part test to determine whether such a facially discriminatory policy should be excepted from Title VII's equal employment mandate due to a safety-based BFOQ. Under the test applied in *Dothard*, in order for gender to be a BFOQ, the employer's evidence must establish that (1) the essence or central mission of its business would be undermined by hiring members of both sexes, and (2) there is a factual basis for believing that all or substantially all persons of one gender could not perform the job duties safely and efficiently. *Id.* at 333, 97 S.Ct. 2720.

Since the *Dothard* test was announced, several federal courts have been faced with cases involving a privacy-based rather than a safety-based BFOQ. Unlike the cases in which customer preference as a reflection of stereotypical thinking has failed to justify discriminatory employment practices,[9] courts have concluded that customer preference having roots in an individual's beliefs regard-

---

9.  *Diaz v. Pan Am. World Airways, Inc.*, 442 F.2d 385 (5th Cir.1971); *Weeks v. Southern Bell Tele-* *phone & Telegraph Co.*, 408 F.2d 228 (5th Cir. 1969).

ing personal privacy and modesty may form the basis of a gender-based BFOQ. As summarized by one court considering a case with facts similar to the one before us, an "expectant mother has a greater right to a preference than the typical business customer or client since '[h]ere personal privacy interests are implicated which are protected by law and which have to be recognized by the employer in running its business.' *Fesel v. Masonic Home of Delaware, Inc.*, 447 F.Supp. 1346, 1352 (D.Del.1978), *aff'd mem.*, 591 F.2d 1334 (3rdCir.1979)." *Equal Empl. Opportunity Comm'n v. Mercy Health Center*, 1982 WL 3108, 5 (W.D.Okla. Feb.2, 1982) (hospital hired only female nurses in labor and delivery unit). Although the United States Supreme Court has not squarely addressed privacy as the basis for a BFOQ, in *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 111 S.Ct. 1196, 113 L.Ed.2d 158 (1991), the Supreme Court pointedly commented that:

We have never addressed privacy-based sex discrimination and shall not do so here because the sex-based discrimination at issue today does not involve the privacy interests of Johnson Controls' customers. Nothing in our discussion of the "essence of the business test," however, suggests that sex could not constitute a BFOQ when privacy interests are implicated.

*Id.* at 206 n. 4, 111 S.Ct. 1196. In examining this excerpt from *Johnson Controls*, a Minnesota United States District Court concluded that "privacy considerations properly enter into the BFOQ analysis where they go to the core of an employee's job performance, and where that performance is involved in the central purpose of the enterprise." *Hernandez v. University of St. Thomas*, 793 F.Supp. 214, 216 (D.Minn.1992). In this vein, courts generally have recognized privacy concerns as justifying a BFOQ in occupations which involve intimate bodily contact or routine exposure of the bodies of service recipients. *See e.g. Jones v. Hinds General Hospital*, 666 F.Supp. 933 (S.D.Miss.1987) (catheterization and other intimate services provided male patients by nurse's aides); *Norwood v. Dale Maintenance System Inc.*,

590 F.Supp. 1410 (N.D.Ill.1984) (washroom attendant); *Brooks v. ACF Industries, Inc.*, 537 F.Supp. 1122 (S.D.W.Va.1982) (janitor cleaning bathhouses and restrooms); *Backus v. Baptist Medical Center*, 510 F.Supp. 1191 (E.D.Ark.1981), *vacated on other grounds*, 510 F.Supp. 1191 (8th Cir.1982) (nurses in obstetrics unit of hospital where intimate procedures performed and female body and genitalia routinely exposed); *City of Philadelphia v. Pennsylvania Hum. Rel. Comm'n*, 7 Pa.Cmwlth. 500, 300 A.2d 97 (1973) (supervisory personnel at youth residential center monitored showers and conducted body searches).

Most federal courts examining BFOQ cases in which privacy interests are raised have modified the *Dothard* test by adding a third component. In cases involving nursing or other patient care positions, courts have upheld discriminatory practices based on demonstrated privacy concerns of clients when an employer demonstrates a factual basis for the employer's belief that: (1) not hiring patient care workers of one sex exclusively would undermine the essence of the business operation, (2) all or substantially all members of a particular sex would be unable to perform the duties of the job in question; and (3) it is not feasible due to the nature of the business operation to assign job responsibilities in a selective manner so as to satisfy both the privacy interests of patients and the equal employment opportunity principles of Title VII.

The court in *Fesel v. Masonic Home of Delaware, Inc.*, 447 F.Supp. 1346 (D.Del. 1978), *aff'd*, 591 F.2d 1334 (3rd Cir.1979), considered a case in which a nursing home refused to hire male nurse's aides due to the privacy interests of its patients. As denoted in the following excerpt, in addition to the factors of the *Dothard* test, the court found that an additional burden should be shouldered by an employer seeking to establish a BFOQ exception based on client privacy interests:

[The] employer must prove not only that it has a factual basis for believing that the hiring of any members of one sex would directly undermine the essence of the job involved or the employer's business, but

also that it could not assign job responsibilities selectively in such a way that there would be minimal clash between the privacy interests of the customers and the nondiscrimination principle of Title VII.

447 F.Supp. at 1351. Finding that the nursing home's refusal to employ males as nurse's aides was justified based on privacy concerns, the *Fesel* court noted that the *Dothard* test was met by the employer's evidence of the intimate personal care duties performed by nurse's aides at the nursing home and by testimony of supervisors, physicians, residents of the home, families of the residents and expert witnesses stating that the female residents would not consent to such care administered by males and would leave the nursing home if males were hired. As to alternative assignment of job duties, the court found that the record showed alternative, selective assignment of job responsibilities was not feasible due to the size of the staff in relation to the shift configuration used at the nursing home.

Applying virtually the same standards, the court in *Jones v. Hinds General Hospital* found a hospital's gender discriminating policy, which resulted in female nurse assistants being laid off before male orderlies with less seniority, was justified for privacy reasons. The evidence relied upon by the *Hinds* court included objection and refusal by a significant number of male patients to procedures of an intimate nature being performed by female assistants, thus precluding all or substantially all females from performing intimate procedures on male patients. Additionally, the court was convinced that no alternative practices with less discriminatory effect existed which would satisfy the legitimate needs of the hospital given the size and organization of the business.

In a case more factually similar to the one before us, a United States District Court in Arkansas concluded that, based on patient privacy and personal dignity concerns, being female was a BFOQ for a hospital's labor and delivery nursing staff. *Backus v. Baptist Medical Center*. In support of its finding that the business operation would be undermined if the practice was not continued, the court in *Backus* cited statements of pa-tients, doctors, nurses, and administrators who testified that male labor and delivery nurses would not be acceptable to obstetrical patients. Also considered were patient complaints which had been filed against the subject nurse based on his gender. Additionally, the court was persuaded by the asserted probability that once a patient became dissatisfied with how services were provided, the patient would go elsewhere for services in the future. With regard to realignment of duties, the court considered evidence of nearly constant exposure of a patient's genitalia in an obstetrics setting and the hospital's policy requiring a female to be present whenever a patient's genital area was examined by a male. As a result, the court in *Backus* concluded that alternative arrangements could not be made to satisfy both the privacy interests and dictates of Title VII without creating unmanageable staffing problems. The same conclusion was reached when the test was applied to comparable evidence in *Equal Employment Opportunity Commission v. Mercy Health Center*, 1982 WL 3108 (W.D.Okla.1982), in which a hospital's policy for hiring only female nurses in the obstetrics department was also at issue.

■ As a result of our study of the factors raised in the foregoing cases, we conclude that where an employer asserts that privacy interests justify gender being a bona fide occupational qualification under West Virginia Code § 5–11–9 (1998), in order to prevail an employer must prove: (1) how the essence or central mission of the business would be undermined by hiring members of both sexes; (2) the factual basis for the employer's belief that all or substantially all members of one gender could not perform the essential duties of the job in question without intruding on legitimate privacy concerns of its patrons; and (3) why alternatives to the gender-excluding policy would be impossible or impractical to achieve. We turn now to the case sub judice to examine whether these standards have been met so as to sustain the entry of summary judgment.

Although our review is de novo, we initially observe that the lower court's findings were based on the general premise that legitimate privacy concerns of Camden–Clark's obstet-

rics patients were established. Some justification for this conclusion may be inferred from the record, in which Patricia Williams, the nurse manager of the obstetrical unit, by affidavit states:

2. Obstetrics is a unique section of the hospital. All obstetrics patients are female. There are few duties that an OB nurse can perform that are not sensitive or intimate. An OB nurse's routine duties include, but are not limited to: (1) checking a patient's cervix for dilation and performing vaginal exams of patients to check for progress of labor, (2) shaving a patient's perineum, (3) sterilizing a patient's vaginal area, (4) checking patients for vaginal bleeding, (5) massaging a patient's fundus, (6) monitoring fetal heartbeats both internally and externally, (7) assisting mothers with breastfeeding [sic], (8) examining a mother's nipples post-brestfeeding [sic], and (9) checking the perineum for bruising and edema.

3. Unlike other areas of the hospital, obstetrics patients constantly have their genitalia exposed. Consequently, it would be impossible to assign male nurses to perform non-intimate duties because most duties of an OB nurse, unlike the duties of nurses in other areas of the hospital, involve exposure of the genitalia.

4. In my personal experience with male student nurses in the obstetrics department, approximately 80% of patients objected to having a male nurse.

We also note that an affidavit of a physician specializing in obstetrics and gynecology with staff privileges at Camden–Clark established that the doctor would refuse to make rounds without a female nurse as a chaperone and related the doctor's belief that it would be inappropriate to have male nurses in the obstetrics unit "[d]ue to concerns with patient comfort level and the nature of the intimate care performed by obstetrical nurses."

The intimate and intrusive procedures routinely performed in the obstetrics department may well raise privacy concerns in patients. Nevertheless, since privacy interests are rooted in the beliefs and mores of individuals, we are troubled by the lack of evidence from patients themselves. Furthermore, the nurse manager's statement regarding eighty percent of the patients objecting to male student nurses provides marginal information in that it fails to quantify the patient population observed, the length of the observation, how long ago the observed events occurred or the degree of and reason for the patients' objection. The actual privacy concerns of patients is not clearly established by such vague testimony. For example, the patients objections can be viewed in more than one way. The patients could have been objecting to *students* providing services versus *males* providing services and that objection could have amounted to refusal of services from males or merely been an expression of disliking change or simple surprise. The ambiguity of Ms. Williams' statement becomes more pronounced when Mr. Slivka's deposition, revealing that other hospitals in the area employ male nurses in their obstetrical units, is taken into account.

Moreover, without further development of the extent of the privacy concerns of the patients, the other portions of the BFOQ test cannot be applied. Without knowing the magnitude of the resistance to male nurses being part of the obstetrical staff, it is difficult to fathom how Camden–Clark could persuasively establish that the essence of its business of patient care would be undermined if it hired male nurses in the obstetrics department. Likewise, absent clarification of the nature and extent of the privacy concerns, realistic alternative methods of operation would be impossible to propose, let alone deem unworkable.

It is thus evident that the extent of the privacy concerns of the recipient of services is necessarily central to the resolution of the issue of whether a privacy-based BFOQ of gender qualifies as an exception to the statutory mandate against discriminatory employment practices. This essential element of the BFOQ defense plainly requires further definition in the instant case. As a consequence, summary judgment in this case is inappropriate because there are unanswered questions involving issues of material fact for which further development of the evidence is desirable in order to apply the law. As one

court aptly observed, "the legal and factual complexities of the BFOQ . . . make it particularly difficult to resolve on a summary judgment motion." *U.S. Equal Employment Opportunity Commission v. Sedita*, 816 F.Supp. 1291, 1298 (N.D.Ill.1993). *See also Hernandez v. University of St. Thomas*, 793 F.Supp. 214, 217 (D.Minn.1992) (remarking that BFOQ defense inherently raises factual issues). Accordingly, we reverse the order of the circuit court and remand the case for further proceedings.

We want to be clear that we are in no way saying that privacy concerns cannot support gender as a BFOQ. Instead, we emphasize the need for employers and ultimately courts to fully examine the factual basis for these practices, especially in cases involving longstanding policies. Personal conduct issues such as modesty are not universally defined and are ever-changing in our society, making it all the more important to avoid assumptions and speculations when dealing with such issues. Gender discrimination may be valid in instances when privacy interests trump the principle of equal employment opportunity. And while accommodation or balancing of both issues is the goal, it is not always practicable. In order to assure that gender-excluding practices are indeed essential to preserve a privacy right, we find it necessary to require a detailed and thorough examination of the circumstances of each case in which gender is raised as a BFOQ. The lack of definition of the extent of the privacy interests at stake in this case is only one area in which the record is deficient. The record is devoid of information about how other hospitals, having comparable patient population, staff size and level of care, reconcile patients' privacy interests in their obstetrics department with the employment rights of male nurses. Without such a backdrop of information, the trial court has no actual basis to determine whether costs, inconvenience, decreased quality of care and similar factors merit consideration. While the ultimate burden of persuasion to establish a BFOQ rests with the employer, the person claiming discrimination needs to be actively involved in developing the evidence. In some cases, the person asserting discrimination is in a better position to identify and demonstrate relevant evidence, including that previously mentioned in this case.

For the reasons stated herein, the September 24, 2002, order of summary judgment entered by the Circuit Court of Wood County is reversed and the case is remanded for further proceedings conforming with this opinion.

Reversed and remanded.

Chief Justice MAYNARD concurs in part and dissents in part and reserves the right to file a separate opinion.

Justice STARCHER concurs and reserves the right to file a concurring opinion.

STARCHER, Justice, concurring:

(Filed March 29, 2004)

It appears from the record that the plaintiff is currently and has been for some time working as an obstetrical nurse in a hospital in Ohio, less than twenty miles away from the Camden–Clark Memorial Hospital—performing the same duties that Camden–Clark says he cannot perform in their hospital.

Ohio is not Denmark. If a nearby hospital can successfully employ the plaintiff as an obstetrical nurse, then it is highly unlikely that Camden–Clark can rebut the weight of that fact—and meet the strict legal test of showing a BFOQ "business necessity" for its genderdiscriminatory policy.

To be clear—Camden–Clark can't just say that "we simply choose to handle employment in our obstetrics unit in a gender-discriminatory way." Rather, Camden–Clark has to show that "Gender discrimination is the *only* way we can do it." Such a showing is pretty difficult when someone else in the neighborhood is in fact "doing it" in a non-discriminatory fashion.

Notwithstanding the concurrence by Justice Maynard, few things are more evident and certain than the substantial evolution and change in modern notions of gender roles. Such evolution, thank goodness, has permitted women to conquer stereotypes and enter into historically all-male bastions like the law. The same is true for professions like nursing. But in this case, it is a man

who is challenging a stereotype. (I can see the argument for keeping women out of the practice of law—"male clients just won't trust a woman to have intimate access to the facts of their case." Of course, I think that such a statement is silly.)

Male doctors, of course, have been treating women "intimately" for hundreds of years. Women patients have not blanched at this fact; therefore, it seems fairly clear to me, that they would not have any legally cognizable grounds for opposing similar treatment from other medical professionals like the plaintiff.

On the limited record before us, I have the impression that Camden–Clark should bring in an expert or two from the outside, sit down with the plaintiff and his counsel, adopt a phase-in plan to get their nursing employment policies in line with modern non-discriminatory practices, settle this case, and move forward—and not waste time and good will fighting a historically rear-guard action based on outmoded stereotypes.

Accordingly, I concur.

MAYNARD, Chief Justice, concurring, in part, and dissenting, in part:

I concur with the new law formulated by the Court which recognizes privacy interests as constituting a BFOQ under W.Va.Code § 5–11–9 (1998). As set forth in the majority opinion, many jurisdictions have held that privacy interests may constitute a BFOQ. In contrast, the plaintiff fails to cite even one case in which a BFOQ based on privacy was expressly rejected. Plainly, the holdings in this case find solid support in reason and common sense, and I wholeheartedly agree with them.

However, I dissent, in part, because I believe that the application of the law to the facts herein mandates affirming the circuit court's grant of summary judgment on behalf of Camden–Clark Memorial Hospital. In its summary judgment order, the circuit court found that,

> based upon the privacy concerns of the hospital's patients and their families, as well as factual evidence that the presence of male nurses in the obstetrics ward has

previously caused, and would continue to cause, conflicts among patients, doctors, and hospital staff, Camden–Clark Hospital has factually established sufficient grounds to demonstrate that it is a permissible BFOQ in the hiring of obstetrical ward nurses that they be females.

The circuit court is correct.

To illustrate just how delicate and sensitive this issue is, I find it necessary to include the remainder of this paragraph, although I find it uncomfortable to do so. An obstetrical nurse at Camden–Clark is routinely required to check a patient's cervix for dilation and perform complete and invasive vaginal exams on patients to check for progress of labor; shave a patient's perineum; sterilize a patient's vaginal area; check patients for vaginal bleeding; massage a patient's fundus; monitor fetal heartbeats both internally and externally; assist mothers with breast feeding; examine a mother's nipples after breast feeding; and visually and manually check the perineum for bruising and edema. Basically, obstetrics patients constantly have their genitalia exposed. In spite of this, the majority finds the "lack of definition of the extent of the privacy interests at stake[.]" In contrast, I believe that the legitimate privacy interests of female patients in not having strange men constantly examine, poke, prod, and stroke their genitalia are crystal clear.

Also, while the majority's reasoning that "[p]ersonal conduct issues such as modesty are not universally defined" may well be true, this case concerns female patients in Parkersburg, West Virginia, not Copenhagen, Denmark, although I suspect that Danish women would see this issue the same as American women. I doubt that female patients in Parkersburg have a significantly different reaction to exposing their genitalia to strange men than female patients in Delaware, Oklahoma, Pennsylvania, Minnesota, Mississippi, or Illinois where courts have recognized privacy concerns as justifying a BFOQ. Finally, although modesty issues may be "ever-changing in our society" to some degree, the privacy concerns at issue here are basic to human nature which has been

essentially unchanged for thousands of years. Therefore, I find no legitimate reason to reverse and remand this case.

In conclusion, I agree with the legal holdings in the majority opinion, but I simply would affirm the circuit court's grant of summary judgment on behalf of Camden–Clark.

Accordingly, I concur, in part, and dissent, in part.